# In the

# United States Court of Appeals

## For the Seventh Circuit

———————

No. 04-1420

CHRISTOPHER LEKAS,

*Plaintiff-Appellant,*

v.

KENNETH BRILEY, et al.,

*Defendants-Appellees.*

———————

Appeal from the United States District Court for
the Northern District of Illinois, Eastern Division.
No. 02 C 5181—**Robert W. Gettleman**, *Judge.*

———————

ARGUED SEPTEMBER 22, 2004—DECIDED APRIL 25, 2005

———————

Before COFFEY, WILLIAMS, and SYKES, *Circuit Judges.*

WILLIAMS, *Circuit Judge.* Christopher Lekas, a prisoner
in the custody of the Illinois Department of Corrections
(IDOC), makes several constitutional claims relating to his
placement and confinement in disciplinary segregation. The
district court dismissed his complaint for failure to state a
claim. We affirm this dismissal because we find that the
allegations of Lekas's complaint effectively plead him out of
court by detailing conditions that do not amount to a
deprivation of a liberty interest, and because he failed to

present arguments before the district court linking the allegations of retaliation in his complaint to his Section 1983 claim, leaving him with no case or controversy upon which to base a constitutional challenge of Section 1997e(e) of the Prison Litigation Reform Act of 1995 (codified at 42 U.S.C. § 1997e(e)).

## I.  BACKGROUND

In reviewing a district court's dismissal of a complaint under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim, we "take the plaintiff's factual allegations as true and draw all reasonable inferences in his favor." *DeWalt v. Carter*, 224 F.3d 607, 612 (7th Cir. 2000) (citing *Strasburger v. Bd. of Educ.*, 143 F.3d 351, 359 (7th Cir. 1998)). While imprisoned at the Pinckneyville Correction Center, Lekas cultivated a relationship on "friendly terms" with one of the prison's female employees—Tyone Murray. By February 2000, however, Lekas was transferred to another IDOC prison—Menard Correctional Center. Once at Menard, Lekas found the prison's medical treatment of his various medical conditions inadequate, leading him and his father to file with the Administrative Review Board (ARB) and highly placed IDOC officials a number of administrative grievances and complaints. At least six of those grievances, which had been filed between July and October of 2000, were denied sometime around November 6, 2000.

In early November of 2000, while still incarcerated at Menard, Lekas mailed Murray a package containing two ceramic mugs and a personal letter via a third party. Under the IDOC's Rule against "Abuse of Privileges" (Rule 310), inmates are prohibited from "corresponding or communicating with a . . . person after the committed person has received notice that such person has informed the [IDOC] that he or she does not wish to receive correspondence from

the committed person." Ill. Admin. Code tit. 20, § 504, Table A. There is, however, no rule against inmates sending mail or gifts to an IDOC facility employee.

Soon after he had mailed his package to Murray, on November 9, 2000, a disciplinary report was issued, stating that Lekas was "being placed on investigative status for his possible involvement in sending unauthorized correspondence."[1] That same day, Lekas was transferred to Stateville Correctional Center, where he was placed in the segregation unit under "investigative status." Lekas was not informed as to the precise basis for his reclassification to "investigative status" until November 17, 2000. At that time, an investigator for the IDOC informed him that he was being questioned regarding the package he sent to Murray. In response to the investigator's questions, Lekas explained that Murray had given him her address, a photograph of herself with her child, and permission to correspond with her. Notwithstanding his explanation, a disciplinary report was issued from Pinckneyville on December 8, 2000, officially charging Lekas with violation of IDOC Rules against "Abuse of Privileges" (Rule 310) and "Dangerous Communications" (Rule 208).[2]

A hearing on these charges was held before the Adjustment Committee at Stateville on December 13, 2000. In response

---

[1] This disciplinary report was issued by defendant C.T. Caraway (an employee at Menard) and approved by defendants Joe Cowan (a Menard employee signing as "Shift Supervisor") and Anthony Ramos (a Menard Correctional Officer signing as "Reviewing Officer").

[2] This second disciplinary report was issued by defendant Tim Laird (a Correctional Lieutenant in Internal Affairs) and approved by defendants Michael Chapman (a Pinckneyville employee acting as "Shift Supervisor"), Theopolas Smith (a Pinckneyville employee acting as "Reviewing Officer"), and P. Brooks (a Pinckneyville employee acting as "Hearing Investigator").

to the Abuse of Privileges charge, Lekas again asserted that Murray had permitted and encouraged his correspondence, and had not, as an "Abuse of Privileges" violation would require, given notice that his correspondence was unwelcome. Furthermore, his custodians proffered no evidence that would suggest that Murray gave such notice, as was their burden to establish the charge. Notwithstanding this alleged lack of evidence, the Adjustment Committee, composed of defendants Carol DelPriore, Daniel Luce, and Michael Dangerfield, found Lekas guilty of Abuse of Privileges, and sentenced him to three months of segregation, demoted him to "C Grade" for three months, and denied him commissary privileges for three months. The committee did, however, find Lekas not guilty of the "Dangerous Communications" charge.

Lekas then pursued an administrative appeal by filing a grievance before the ARB, asserting, *inter alia*, that the process of his disciplinary proceedings had violated his civil rights. But that grievance also failed, and allegedly resulted in its own, independent violations of department rules on grievance proceedings.[3]

When all was said and done, Lekas had served about 90 days in segregated confinement—from November 9, 2000 until approximately February 9, 2001. While in segregation, he was unable to participate in prison programs, educational programs, and work programs; he lost prison employment, wages, contact visits, telephone privileges, visits

---

[3] Lekas alleges that the Chairman of the ARB (defendant Robert Radmacher) violated IDOC Rule 850(e) and (f) (codified at Ill. Admin. Code tit. 20, § 504, Table A), which require that all ARB decisions be reviewed and approved by the IDOC Director (here, defendant Donald N. Snyder, Jr.), by reviewing and concurring with his own decision by signing the Director's name to the report. Lekas lodged a grievance regarding this practice by Radmacher, but ultimately this complaint, too, was denied.

from clergy, and access to church; and he was allowed fewer visits from family, exercise privileges, commissary privileges, personal possessions, and audio/visual items. According to his complaint, these conditions were "significantly atypical" from those in the general prison population.

Lekas, proceeding *pro se*, filed a Section 1983 claim in federal district court, alleging that several of his custodians violated his due process rights by depriving him of a liberty interest created by Illinois law when they placed him in segregation in contravention of the department's own rules. The district court immediately dismissed the complaint *sua sponte*, pursuant to 28 U.S.C. § 1915(e)(2)(B), for failure to state a claim upon which relief could be granted, reasoning that this Circuit had already found in cases such as *Williams v. Ramos*, 71 F.3d 1246 (7th Cir. 1995) that the conditions of segregation in Illinois prisons did not create such an "atypical and significant hardship" as to give rise to an enforceable liberty interest. Lekas, however, prevailed upon the court to reinstate his case by arguing in a Motion for Relief from Judgment under Federal Rule of Civil Procedure 60(b) that conditions of segregation at Stateville had taken a turn "for the worse" since *Williams* was decided. Thereafter, Lekas was appointed counsel, and ultimately granted leave to file a Second Amended Complaint.

The Second Amended Complaint states two claims for relief. Count I, brought pursuant to 42 U.S.C. § 1983, alleges that the various prison employees named above, as well as defendant Kenneth Briley (the Chief Administrative Officer of Stateville)—together, "State Defendants"—violated his constitutional right to procedural due process by placing him in disciplinary segregation in contravention of their own mandatory department rules, and without evidence supporting the elements of the charge that would warrant his segregation. Count II joins the U.S. Attorney General ("Federal Defendant") seeking a declaratory judgment that Section 1997e(e) of the Prison Litigation Reform Act of 1995

is unconstitutional both facially and as applied to the facts of this case. This second count asserts that Section 1997e(e) deprives prisoners of due process and denies them equal protection by leaving them without remedy for constitutional deprivations resulting in solely non-physical injuries.

The district court, however, dismissed this Second Amended Complaint upon motions by both State and Federal Defendants under Federal Rule of Civil Procedure 12(b)(6). In particular, the court found that Count I failed to state a claim because Lekas's segregation as alleged did not amount to a deprivation of a liberty interest and therefore could not form the basis of a procedural due process claim. With respect to Count II, the court found Lekas's Section 1997e(e) challenge "untenable," concluding that the provision was "merely a limitation on recovery," and not—as the complaint alleged—an outright bar. Lekas appeals.

## II. ANALYSIS

A complaint may be dismissed under Rule 12(b)(6) for "failure to state a claim upon which relief can be granted." Accordingly, a complaint's ability to survive a Rule 12(b)(6) challenge inevitably turns on its ability to satisfy Rule 8 of the Federal Rules of Civil Procedure—the general rules of pleading a claim for relief. Under Federal Rule of Civil Procedure 8(a)(2), plaintiff's complaint need only contain "a short and plain statement of the claim showing that the pleader is entitled to relief." This "short and plain statement," with irrelevant exceptions, requires the plaintiff to plead merely "the bare minimum facts necessary to put the defendant on notice of the claim so that he can file an answer," *Higgs v. Carver*, 286 F.3d 437, 439 (7th Cir. 2002), and not an exhaustive recitation of the facts or elements of that claim, *Walker v. Thompson*, 288 F.3d 1005, 1007 (7th Cir. 2002). Indeed, "[a] complaint should be dismissed for failure to state a claim only if no relief could be granted

under any set of facts that could be proved consistent with the allegations." *DeWalt v. Carter*, 224 F.3d 607, 612 (7th Cir. 2000) (internal quotations omitted); *see also Hishon v. King & Spalding*, 467 U.S. 69, 73 (1984) (finding dismissal under Rule 12(b)(6) proper "only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations"); *Sanville v. McCaughtry*, 266 F.3d 724, 732 (7th Cir. 2001) ("[I]f it is possible to hypothesize a set of facts, consistent with the complaint, that would entitle the plaintiff to relief, dismissal under Rule 12(b)(6) is inappropriate." (quoting *Veazey v. Communication & Cable of Chi., Inc.*, 194 F.3d 850, 854 (7th Cir. 1999))).

Within this liberal framework of notice pleading, Lekas seeks to state a claim against State Defendants under 42 U.S.C. § 1983. "In order to state a claim under Section 1983, a plaintiff must allege that the defendants deprived him of a right secured by the Constitution or laws of the United States, and that the defendants acted under color of state law." *Brokaw v. Mercer County*, 235 F.3d 1000, 1009 (7th Cir. 2000); *see also Gomez v. Toledo*, 446 U.S. 635, 640 (1980). Here, Lekas has alleged that the State Defendants denied him a liberty interest protected by the due process clause of the Fourteenth Amendment by placing him in disciplinary segregation without affording him beforehand the procedural protections of due process. There is no dispute that Lekas's complaint adequately alleges that the defendants acted under color of state law. What is in dispute is whether Lekas has sufficiently alleged a violation of a federal right.

Lekas argues that his due process rights were violated because he was placed in disciplinary segregation without any evidence to support the key elements of the infraction of which he was charged, and because the IDOC failed to follow its own mandatory departmental rules for conducting his discipline hearing and administrative review. However,

before wrestling with the contours and nuances of the process allegedly rendered or withheld, we must first determine whether *any* process was in fact constitutionally due.

The Due Process Clause of the Fourteenth Amendment provides: "[N]or shall any State deprive any person of life, liberty, or property, without due process of law." U.S. CONST. amend XIV, § 1. Accordingly, the procedural protections of the Due Process Clause will only be triggered if state action implicates a constitutionally protected interest in life, liberty, or property. *Bd. of Regents of State Colleges v. Roth*, 408 U.S. 564, 570-71 (1972) (noting that "whether due process requirements apply in the first place" depends on whether an "interest is within the Fourteenth Amendment's protection of liberty and property"); *see also Carey v. Piphus*, 435 U.S. 247, 259 (1978) ("Procedural due process rules are meant to protect persons not from the deprivation, but from the mistaken or unjustified deprivation of life, liberty, or property."). Thus it follows that a plaintiff cannot under Section 1983 complain of procedural due process violations unless the state has first deprived him or her of such a constitutionally protected interest. *Kentucky Dept. of Corr. v. Thompson*, 490 U.S. 454, 460 (1989) ("We examine procedural due process questions in two steps: the first asks whether there exists a liberty or property interest which has been interfered with by the State, the second examines whether the procedures attendant upon that deprivation were constitutionally sufficient." (citations omitted)); *Williams v. Ramos*, 71 F.3d 1246, 1248-49 (7th Cir. 1995) ("When a plaintiff brings an action under § 1983 for procedural due process violations, he must show that the state deprived him of a constitutionally protected interest in 'life, liberty, or property' without due process of law.") (citing *Zinermon v. Burch*, 494 U.S. 113, 125-26 (1990)).

Here, the alleged deprivation to Lekas was his placement in disciplinary segregation—purportedly in contravention

of a liberty interest. "The Due Process Clause," however, "does not necessarily protect prisoners against the imposition of disciplinary segregation." *Williams v. Ramos*, 71 F.3d 1246, 1249 (7th Cir. 1995). Rather, prison administrators are "accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." *Bell v. Wolfish*, 441 U.S. 520, 547 (1979). For this reason, "[a] prisoner has no liberty interest in remaining in the general population." *Williams*, 71 F.3d at 1248; *see also Sandin v. Conner*, 515 U.S. 472, 484-86 (1995), *Hewitt v. Helms*, 459 U.S. 460, 467-68 (1983); *Meriwether v. Faulkner*, 821 F.2d 408, 414 (7th Cir. 1987).

But here Lekas does not merely object to his placement in disciplinary segregation, but rather his placement there in contravention of the IDOC's own mandatory rules and regulations. Indeed, prior to the Supreme Court's ruling in *Sandin v. Conner*, statutory or regulatory "language of an . . . unmistakably mandatory character"—such as that provided by IDOC rules and regulations—was recognized as creating a liberty interest protected by the Due Process Clause. *Hewitt*, 459 U.S. at 471-72; *see also Sandin*, 515 U.S. at 481-83; *Thomas v. Ramos*, 130 F.3d 754, 760 (7th Cir. 1997); *Williams*, 71 F.3d at 1249. The *Sandin* Court, however, abandoned the methodology of *Hewitt* and its progeny, shifting the focus of the liberty interest inquiry away from the nature of the statutory and regulatory *language* and toward the nature of the *deprivation* actually suffered by the prisoner. Thus, today, a prisoner's liberty interest, and incumbent entitlement to procedural due process protections, generally extends only to freedom from deprivations that "impose[ ] atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin*, 515 U.S. at 483-84. In the absence of such "atypical and significant" deprivations, the procedural protections of the Due Process Clause will not be triggered.

Now much hinges upon what constitutes an "atypical and significant hardship," and the *Sandin* Court again provides guidance. In finding that the placement of the plaintiff-prisoner in disciplinary segregation for thirty days did not constitute an "atypical and significant hardship," the *Sandin* Court relied upon three factors. First, the prisoner's "disciplinary segregation, with insignificant exceptions, mirrored those conditions imposed upon inmates in administrative segregation and protective custody." *Sandin*, 515 U.S. at 486. Second, "a comparison between inmates inside and outside disciplinary segregation [revealed that] the State's action in placing [plaintiff in disciplinary segregation] for 30 days did not work a major disruption in his environment." *Id.* Finally, "the State's action [would not] inevitably affect the duration of [plaintiff's] sentence." *Id.* at 487. Accordingly, courts today charged with assessing whether conditions of confinement pose an atypical and significant hardship are in essence counseled by *Sandin* to (1) compare the conditions of disciplinary segregation to those of discretionary segregation;[4] (2) compare the conditions of disciplinary segregation to those in the general prison population; and (3) determine whether the disciplinary action affects the length of the inmate's sentence.

---

[4] The term "discretionary segregation"—encompassing both administrative segregation and protective custody—refers to "single-person cells in which persons are sometimes confined not because they have misbehaved but simply because the prison has no other space, wishes to protect some prisoners from others, wishes to keep prisoners isolated from one another in order to minimize the risks of riots or other disturbances, wishes to prevent the spread of disease, and so forth." *Wagner v. Hanks*, 128 F.3d 1173, 1176 (7th Cir. 1997). Such nondisciplinary segregation is also employed for prisoners who are an escape risk, incorrigible, gang leaders, or awaiting transfer or classification. *Id.* at 1174. *See also Hewitt v. Helms*, 459 U.S. 460, 468 (1983).

There remains, however, some doubt as to how courts should weigh these three factors. Certainly, the third factor—prolonging the prisoner's incarceration—persists as both a universally accepted and readily ascertainable basis for a due process claim in this area. *Wagner v. Hanks*, 128 F.3d 1173, 1176 (7th Cir. 1997) ("When [prison discipline] takes the form of prolonging the prisoner's incarceration or otherwise depriving him of what has been held to be liberty or property within the meaning of the due process clauses, it is securely actionable."). Lekas, however, does not allege that his segregation prolonged his sentence. Rather, what continues to be perplexing is the comparison group against which the conditions of disciplinary segregation are to be compared. While *Sandin* suggests the confinement be compared against both discretionary segregation as well as the general prison population, the realities of prison administration suggest that these two control groups are in fact one and the same.

*Sandin*'s prescribed comparison between disciplinary segregation and the general prison population seems inevitably subsumed by its prescribed comparison between disciplinary segregation and discretionary segregation. This is because, in every state's prison system, any member of the general prison population is subject, without remedy, to assignment to administrative segregation or protective custody at the sole discretion of prison officials, *Wagner*, 128 F.3d at 1176 ("[E]ven a prisoner who had committed a white-collar crime and had been assigned to the lowest-security prison in the state's system might find himself in segregation for a nondisciplinary reason."); *see also Hewitt*, 459 U.S. at 468 ("[A]dministrative segregation is the sort of confinement that inmates should reasonably anticipate."); *Meriwether v. Faulkner*, 821 F.2d 408, 414 (7th Cir. 1987) ("Given the broad uses of administrative segregation . . . inmates should reasonably anticipate being confined in administrative segregation at some point during their incar-

ceration."); if for no other reason than to alleviate over-crowding concerns within the prison. *See also supra*, note 4 (listing various valid purposes for discretionary segregation). Such reassignment from the general population to discretionary segregation does not constitute a deprivation of a liberty interest. *Sandin*, 515 U.S. at 486; *Hewitt*, 459 U.S. at 468; *Crowder v. True*, 74 F.3d 812, 815 (7th Cir. 1996) (holding that the placement of an inmate in nondisciplinary segregation for three months did not constitute a deprivation of a liberty interest); *see also Williams*, 71 F.3d at 1248 ("A prisoner has no liberty interest in remaining in the general population."). Because any member of the general prison population may at any time find himself in segregation for a nondisciplinary reason, the conditions of discretionary segregation provide the most apt benchmark for assessing whether the nature of a plaintiff's confinement in disciplinary segregation works "a major disruption in his environment." Thus, when a court compares disciplinary segregation to the general prison population, it is effectively comparing disciplinary segregation to discretionary segregation. Accordingly, "under *Sandin* the key comparison is between disciplinary segregation and nondisciplinary segregation rather than between disciplinary segregation and the general prison population." *Wagner v. Hanks*, 128 F.3d 1173, 1175 (7th Cir. 1997).

Indeed, taking *Sandin*'s prescribed comparisons to their logical extremes, it is possible that the conditions of discretionary segregation against which the plaintiff's confinement is to be judged are not necessarily those of the prison in which the plaintiff is incarcerated, but rather those of the most restrictive prison in the state penal system, *Wagner v. Hanks*, 128 F.3d 1173, 1175 (7th Cir. 1997) ("We do not think that comparison can be limited to conditions in the same prison, unless it is the state's most secure one. To distinguish between the different parts of the same prison, on the one hand, and the different prisons in the same sys-

tem, on the other, would be arbitrary.") (internal citations omitted), and perhaps even those of the most restrictive prison in the entire country, *id.* at 1176 ("The logic of *Sandin* implies that the conditions of [plaintiff's] disciplinary segregation are atypical only if no prison in the United States to which he might be transferred for nondisciplinary reasons is more restrictive."). This is a harsh, and perhaps unintentional, result. But it is also inescapable, in light of the fact that a prisoner may be transferred from one state prison to another without implicating the inmate's liberty interest—even where the conditions of the destination prison are "much more disagreeable" than those of the originating prison. *Meachum v. Fano*, 427 U.S. 215, 225 (1976); *see also Montayne v. Haymes*, 427 U.S. 236, 242 (1976) ("As long as the conditions or degree of confinement to which the prisoner is subjected is within the sentence imposed upon him and is not otherwise violative of the Constitution, the Due Process Clause does not in itself subject an inmate's treatment by prison authorities [including prison transfers] to judicial oversight.").

Suffice it to say, "when the entire sanction is confinement in disciplinary segregation for a period that does not exceed the remaining term of the prisoner's incarceration, it is difficult to see how after *Sandin* it can be made the basis of a suit complaining about a deprivation of liberty." *Wagner*, 128 F.3d at 1176. With this understanding of the law, we turn to the allegations of Lekas's complaint.

Here, Lekas attempts to plead a deprivation of a liberty interest—*i.e.*, an atypical and significant hardship—by alleging the following:

> The conditions to which Plaintiff was subjected while in segregation at Stateville from November 9, 2000 until approximately February 9, 2001 differed markedly and appreciably from, and were significantly atypical from, those of the general prison population, including but not limited to: inability to

> participate in prison programs, inability to partici-
> pate in educational programs, inability to par-
> ticipate in work programs and resulting loss of
> prison employment and wages, loss of contact visits,
> loss of telephone usage, inability or substantially
> curtailed ability to receive visits from family, ina-
> bility to attend church, no visits from clergy, drastic
> reduction in exercise privileges and in commissary
> access both in terms of frequency and the types of
> items allowed, drastic reduction in the number and
> nature of personal items that prisoners are allowed
> to have in their possession, and no access or very
> little access to audio/visual items.

Second Amended Complaint ¶ 31.

This court has twice before had the opportunity to com-
pare conditions of disciplinary segregation to those of dis-
cretionary segregation at Lekas's prison (Stateville), on
both occasions holding that the conditions of disciplinary
segregation there were not so atypical and significant as to
constitute a deprivation of a liberty interest. *Williams v.
Ramos*, 71 F.3d 1246 (7th Cir. 1995); *Thomas v. Ramos*, 130
F.3d 754 (7th Cir. 1997). In fact, the conditions of dis-
ciplinary segregation at Stateville found by the *Williams*
and *Thomas* courts seven to ten years ago are strikingly
similar to those complained of by Lekas today. In *Williams*,
the plaintiff-prisoner had been locked in a closed-front cell
for 19 days, 24 hours a day, prohibited from participating in
general population activities, handcuffed whenever he left
his cell, and substantially deprived of contact with other
inmates and staff. *Williams*, 71 F.3d at 1249.

In *Thomas*, the plaintiff-prisoner (Thomas) was subjected
to 24 hour a day segregation[5] for 70 days in a locked cell.

---

[5] Unlike Lekas, who was allegedly placed in solitary confinement,
the plaintiff-prisoner in *Thomas* was confined with another in-
(continued...)

*Thomas*, 130 F.3d at 757-58, 761. Even more akin to Lekas's confinement, Thomas was prohibited from participating in prison programs, including all classes and programs offered to inmates in the general population and protective custody. *Id.* at 760. He was "barred from all prison activities, including, among others, educational and work programs," resulting in an inability to work at assignments and earn pay. *Id.* at 758, 760. Thomas had "little contact with any other people," was prohibited from accessing the prison "day room," and was allowed to leave his cell only to visit with a doctor and the segregation superintendent, *id.* at 757-58, 760—suggesting the deprivation of contact visits, visits from clergy, and visits from family, as well as an inability to attend church or use a telephone. He was completely denied exercise privileges, both in the yard and the gym, *id.* at 758, 760 (*cf.* Second Amended Complaint ¶ 31 (alleging only a "drastic reduction" of Lekas's exercise privileges, as opposed to a complete denial)), and he lost all commissary privileges, *id.* at 757, 762 n.8 (*cf.* Second Amended Complaint ¶ 31 (alleging only a "drastic reduction" of Lekas's commissary access, as opposed to a complete loss)).

Notwithstanding the litany of deprivations set forth in *Williams* and *Thomas*, this court in both cases, employing both *Sandin* prescribed comparisons, found that the conditions of Stateville disciplinary segregation were not actionably different from those in either the general prison population, *Thomas*, 130 F.3d at 762 ("In spite of [plaintiff's] extended period in disciplinary segregation, we are convinced that it did not result in an atypical and significant deprivation because the conditions he experienced did not

---

5  (...continued)

mate. However, that assignment in *Thomas* presented a different, perhaps more onerous, hardship, in that two inmates were forced to share a cell "approximately as wide as [the plaintiff's] outstretched arms and twice that long." *Thomas*, 130 F.3d at 757.

greatly exceed what one could expect from prison life gen-
erally.") (quotations omitted); *Williams*, 71 F.3d at 1250 ("We
do not believe, however, that [plaintiff's] catalogue of harms
greatly exceeds what one could expect from prison life gen-
eraslly, as '[l]awful imprisonment necessarily makes unavail-
able many rights and privileges of the ordinary citizen, a
retraction justified by the considerations underlying our
penal system.' ") (quoting *Wolff v. McDonnell*, 418 U.S. 539,
555 (1974)); or discretionary segregation, *Thomas*, 130 F.3d
at 762 ("[T]here is no indication that persons in disciplinary
segregation [at Stateville] receive treatment substantially
different than that given persons in discretionary types of
segregation.") (quoting *Williams*, 71 F.3d at 1250). Accord-
ingly, in both cases, this court found that the conditions of
disciplinary segregation at Stateville were not so atypical
and significant as to constitute a deprivation of an inmate's
liberty interest. *Thomas*, 130 F.3d at 762; *Williams*, 71 F.3d
at 1250.

However, the fact that the conditions of disciplinary se-
gregation at Stateville were found over seven to ten years
ago not to work a deprivation of a liberty interest alone does
not warrant the dismissal of Lekas's claim. Indeed, recogni-
tion of this fact led the district court to reinstate Lekas's
case. Within the spacious universe of possibilities at this
stage of the litigation, limited only by a court's ability to
hypothesize reasonably facts consistent with the allegations
of the complaint, *Sanville v. McCaughtry*, 266 F.3d 724, 732
(7th Cir. 2001), it is reasonably possible that conditions at
Stateville may have changed for the worse over the years
since *Williams* and *Thomas* were decided.

A comparison of our past rulings on the conditions of
disciplinary segregation at Stateville to those conditions
alleged in the case at bar, however, suggests that little, if
anything, has changed in the prison's administration of dis-
ciplinary segregation over the past seven to ten years.
While Lekas insists that those conditions have deteriorated

since our pronouncements in *Williams* and *Thomas*, his own complaint betrays his argument. Lekas's complaint alleges in painstaking detail the deprivations he has putatively endured—deprivations virtually indistinguishable from those found in *Williams* and *Thomas*, save for the duration of his punishment.[6] But while Lekas's 90 day segregation was longer than the 19 day confinement in *Williams* and even the 70 day segregation in *Thomas*, it was still not so long as to work an atypical and significant hardship. *Whitford v. Boglino*, 63 F.3d 527, 533 (7th Cir. 1995) ("[E]ven if prisoners are entitled to due process protections before extreme terms of segregation are imposed, [a] sentence of six months "is not such an extreme term.").[7] Though he was not required to set forth such particular facts in his complaint, *Higgs v. Carver*, 286 F.3d 437, 439 (7th Cir. 2002) (interpreting the "short and plain statement" requirement of Rule 8(a)(2) as requiring allegations of no more than "the bare minimum facts necessary to put the defendant on notice of the claim so that he can file an

---

[6] Lekas's counsel at oral argument placed great emphasis on the fact that the plaintiffs in both *Sandin* and *Williams* had, unlike Lekas, voluntarily requested placement in segregation prior to the segregation of which they ultimately and respectively complained. While such requests can serve as evidence that the hardships of segregation are neither atypical nor significant, "we do not think a prisoner's subjective expectation is dispositive of the liberty interest analysis." *Sandin v. Connor*, 515 U.S. 472, 486 n.9 (1995).

[7] Furthermore, for the first 34 days of his confinement, Lekas was being held under investigative status and temporary confinement, not disciplinary segregation. Second Amended Complaint at ¶¶ 30, 38, 45, 48. Because "[b]oth temporary confinement and investigative status have been determined to be discretionary segregation, and do not implicate a liberty interest," *Thomas*, 130 F.3d at 761, the net duration of Lekas's *disciplinary* segregation was only about 56 days—falling well short of an atypical and significant term of punishment.

answer"), his decision to do so has subjected his complaint to the indistinguishable, binding force of precedent that now threatens to preclude his claims from moving forward. The detailed hardships of which Lekas complains, as our precedent reveals, are not so atypical and significant as to constitute a deprivation of a liberty interest, and thereby fail to trigger procedural due process protections.

We note, however, that the complaint's catalogue of deprivations is non-exhaustive. Second Amended Complaint ¶ 31 (listing hardships "including, but not limited to," those set forth therein). This hedging by Lekas precludes the court from dismissing his claim solely on the basis of his prolix recitation of hardships. *American Nurses' Association v. Illinois*, 783 F.2d 716, 725 (7th Cir. 1986) (finding that, where particular discriminatory practices listed by a complaint in support of a sex discrimination action are "merely illustrative ('not limited to'), the complaint would not fail even if none of [the listed discriminatory practices] were actionable"). Nonetheless, there remains an alternate and independent ground on which we affirm the complaint's dismissal.

A plain reading of Lekas's complaint compels us to conclude that the conditions of disciplinary segregation at Stateville do not differ in the slightest from those in discretionary segregation. The many deprivations Lekas is alleged to have endured occurred during his placement in what he generically refers to as "segregation at Stateville from November 9, 2000 until approximately February 9, 2001." Second Amended Complaint ¶ 31. While this blanket reference alone suggests that Lekas was subjected to only one classification of segregation without distinction during the 90 day span between November 9, 2000 and February 9, 2001, a closer examination of his complaint reveals otherwise. According to his complaint, Lekas was "placed in the segregation unit and classified under investigative

status" on November 9, 2000. Second Amended Complaint ¶ 30. By December 8, 2000, he was "ordered [to] continue . . . in 'Temporary Confinement'" while awaiting a hearing on the offense with which he was charged. Second Amended Complaint ¶ 38. "Both temporary confinement and investigative status," however, "have been determined to be *discretionary segregation*, and do not implicate a liberty interest." *Thomas*, 130 F.3d at 761 (emphasis added). It was not until December 13, 2000—when the adjustment committee found him guilty of the "Abuse of Privileges" charge—that Lekas's disciplinary segregation began. Second Amended Complaint ¶¶ 45, 48. Thus, the 90 day segregation of Lekas alleged by the complaint—a span running from November 9, 2000 to February 9, 2001—covers both a 34 day stint in discretionary segregation and a 56 day stretch in disciplinary segregation.

Despite this reclassification from discretionary to disciplinary segregation on December 13, Lekas does not allege any change in the conditions of his confinement commensurate with that reclassification. Indeed, by failing to even distinguish between the two—opting instead to lump them both together under the single rubric of "segregation"—his complaint avers that the conditions and commensurate hardships of both were in fact identical. By averring identical conditions in both disciplinary and discretionary segregation, Lekas's complaint itself suggests, in the very least, that the conditions of his confinement did not materially change upon his assignment to disciplinary segregation. Certainly, a comparison of the conditions of discretionary and disciplinary segregation as alleged in the complaint cannot yield a hardship so atypical and significant as to deprive Lekas of a liberty interest. *See Wagner v. Hanks*, 128 F.3d 1173, 1175 (7th Cir. 1997) ("[Where] the facilities and conditions are indeed the same in disciplinary and nondisciplinary segregation except that prisoners in administrative segregation or protective custody may be permitted 'contact'

visits and are entitled to make phone calls to persons other than lawyers[,] [t]he denial of so limited an increment of privileges would be unlikely to effect a *significant* deprivation of liberty.").

Thus, the fatal deficiency in Lekas's complaint is not that it alleges too little, but that it alleges too much. Indeed, no more than an allegation of a "loss of liberty" is required to satisfy the requirements of notice pleading under the Federal Rules of Civil Procedure. *Wagner*, 128 F.3d at 1174. In contrast, here Lekas alleges detailed hardships largely indistinguishable from those already found not to implicate a prisoner's remaining liberty interest, and conditions of disciplinary segregation completely indistinguishable from conditions of discretionary segregation. Such pleading reveals that Lekas has not been deprived of a liberty interest, and thereby deprives him of any ground on which to invoke the protections of procedural due process. By virtue of his complaint's description of conditions in disciplinary segregation that mirror those in discretionary segregation, and in light of its detailed recitation of hardships that fall short of a liberty deprivation, Lekas has pled himself out of court. *American Nurses' Association*, 783 F.2d at 725 ("A plaintiff who files a long and detailed complaint may plead himself out of court by including factual allegations which if true show that his legal rights were not invaded."); *see also Ciarpaglini v. Saini*, 352 F.3d 328, 331 (7th Cir. 2003) (holding that plaintiff "has simply pled himself out of court by saying too much"); *Jackson v. Marion County*, 66 F.3d 151, 153 (7th Cir. 1995) ("[A] plaintiff can plead himself out of court by alleging facts which show that he has no claim, even though he was not required to allege those facts."); *Wroblewski v. City of Washburn*, 965 F.2d 452, 459 (7th Cir. 1992) ("We are not required to ignore facts alleged in the complaint that undermine plaintiff's claim."). Accordingly, we do not reach the question of whether the administrative process actually

afforded Lekas in securing his disciplinary segregation passes constitutional muster.

We briefly address Lekas's Section 1983 retaliation claim. "An act taken in retaliation for the exercise of a constitutionally protected right is actionable under § 1983 even if the act, when taken for a different reason, would have been proper." *Matzker v. Herr*, 748 F.2d 1142, 1150 (7th Cir. 1984), *limited on other grounds by*, *Salazar v. Chicago*, 940 F.2d 233, 240-41 (7th Cir. 1991). This includes retaliation against an inmate for exercising his constitutional right to access the courts or to use the prison grievance process. *See, e.g.*, *Babcock v. White*, 102 F.3d 267, 274-76 (7th Cir. 1996). Indeed, a prisoner can sufficiently state a claim for relief when he alleges that prison officials issued baseless disciplinary tickets against him in retaliation for pursuit of administrative grievances. *Black v. Lane*, 22 F.3d 1395, 1402-03 (7th Cir. 1994). Here, Lekas's complaint alleges that the investigation and segregation to which IDOC officials subjected him "was undertaken in retaliation against [him] for, *inter alia*, his filing of prior grievances." Second Amended Complaint ¶ 25. Unlike his other claims, this retaliation allegation was not set forth in a separate count. Nonetheless, such allegations would be sufficient in form to state a retaliation claim under the notice pleading requirements of Rule 8(a)(2).

Lekas, however, has waived his retaliation claim. "[W]hat is fatal to [a] theory on appeal is [plaintiff's] failure to mention it to the district court when the time did come in the proceedings below to present legal arguments linking the claims described in the complaint to the relevant statutory (or other) sources for relief." *Teumer v. General Motors Corp.*, 34 F.3d 542, 545-46 (7th Cir. 1994); *Kirksey v. R.J. Reynolds Tobacco Co.*, 168 F.3d 1039, 1041 (7th Cir. 1999) (noting that even though a complaint may comply with the simple notice pleading requirements of Rule 8(a)(2), it may nonetheless be dismissed under Rule 12(b)(6) if the

plaintiff does not present legal arguments supporting the "substantive adequacy" or "legal merit" of that complaint). While Lekas alleged in his complaint that his segregation was in retaliation for his filing of grievances, he did not present legal arguments or cite relevant authority to substantiate that claim in responding to defendants' motion to dismiss or in his own Rule 59(e) motion to alter or amend the judgment.[8] "Our system of justice is adversarial and our judges are busy people. If they are given plausible reasons for dismissing a complaint, they are not going to do the plaintiff's research and try to discover whether there might

---

[8] In response to the defendants' motion to dismiss, Lekas merely makes passing reference to retaliatory motives on the part of prison officials. This brief states that he "believes and so alleges that the real reason for the investigative report was retaliation for previously filed grievances"; that "the Constitutional deprivation was, in part, due to retaliation for prior claims and grievances he had filed"; and that his placement in segregation was "based on flawed procedures and retaliatory conduct." Response to Defendants' Motion to Dismiss at 2, 14, 15. These statements alone—made without any reference to relevant legal authority, and strewn about in his brief in the context of defending other, well-articulated claims—do not suffice to mount a legal argument that would alert the district court to the ostensible merits of a separate Section 1983 retaliation claim.

In the alternative, Lekas contends that defendants in their motion to dismiss did not challenge the retaliation claim, and that he was therefore not obliged at that stage to defend it against their Rule 12(b)(6) challenge. Even accepting plaintiff's argument, it is inescapable that the district court in granting defendants' motion to dismiss dismissed *all* claims brought by Lekas. If Lekas believed the district court had dismissed an unchallenged retaliation claim in error, then the burden was on him to salvage that claim through a Motion to Amend or Alter Judgment pursuant to Federal Rule of Civil Procedure 59(e). While Lekas did file such a motion under Rule 59(e), neither the word "retaliation" nor any derivation thereof can be found therein.

be something to say against the defendants' reasoning." *Kirksey*, 168 F.3d at 1041. Accordingly, Lekas's Section 1983 retaliation claim has been waived.

Finally, because we affirm the dismissal of Lekas's Section 1983 due process claim and recognize the waiver of his Section 1983 retaliation claim, no "case or controversy" remains between these parties. In the absence of an actual controversy, this court remains both constitutionally and statutorily constrained from reaching Lekas's second count seeking a declaratory judgment that Section 1997e(e) of the Prison Litigation Reform Act of 1995 (codified at 42 U.S.C. § 1997e(e)) is unconstitutional. *See Deveraux v. City of Chicago*, 14 F.3d 328, 330 (7th Cir. 1994) ("[C]ourts may not exercise [their] discretionary power [to issue declarations under the Declaratory Judgment Act)] in the absence of an 'actual controversy' between the parties."); *see also* U.S. CONST. Art. III, § 2; Declaratory Judgment Act, 28 U.S.C. § 2201. Accordingly we affirm the district court's dismissal of this count as well.

## III.  CONCLUSION

For the reasons stated above, we AFFIRM the district court's dismissal of Lekas's claims against both state and federal defendants.


A true Copy:

      Teste:


                           _____
                           *Clerk of the United States Court of*
                           *Appeals for the Seventh Circuit*