In the

# United States Court of Appeals

### For the Seventh Circuit

No. 11-3914

TONI TOSTON,

*Plaintiff-Appellant*,

*v.*

MICHAEL THURMER, *et al.*,

*Defendants-Appellees*.

Appeal from the United States District Court
for the Eastern District of Wisconsin.
No. 2:10-cv-288-JPS—**J. P. Stadtmueller**, *Judge*.

SUBMITTED MAY 16, 2012—DECIDED AUGUST 2, 2012

Before POSNER, MANION, and KANNE, *Circuit Judges*.

POSNER, *Circuit Judge*. The plaintiff, an inmate of a Wisconsin prison, brought this suit against prison officials under 42 U.S.C. § 1983, complaining of violations of his rights of free speech and due process. The district judge dismissed the due process claim and granted summary judgment for the defendants on the free speech claim, with which we begin.

The plaintiff had checked out two books from the prison library, and he also purchased (with the prison's

permission) a copy of *To Die for the People: The Writings of Huey P. Newton* (1972)—the founder of the Black Panthers. The plaintiff copied on a sheet of paper the Panthers' "Ten-Point Program," *id*. at 3-6, which appears in all three books and reads as follows:

1. We want freedom. We want power to determine the destiny of our Black Community.

2. We want full employment for our people.

3. We want an end to the robbery by the white man of our black community.

4. We want decent housing fit for shelter of human beings.

5. We want education for our people that exposes the true nature of this decadent American society. We want education that teaches us our true history and our role in the present-day society.

6. We want all Black men to be exempt from military service.

7. We want an immediate end to POLICE BRUTALITY and MURDER of Black people.

8. We want freedom for all black men held in federal, state, county and city prisons and jails.

9. We want all Black people when brought to trial to be tried in court by a jury of their peer group or people from their Black communities, as defined by the Constitution of the United States.

10. We want land, bread, housing, education, clothing, justice and peace.

He put the sheet in the footlocker in his cell. A guard discovered the sheet in a random search of the cell, and the plaintiff was charged in a prison disciplinary proceeding with possession of "gang literature" in violation of Wis. Admin. Code DOC § 303.20(3). He was found guilty and given 90 days of confinement in segregation. The prison also destroyed the sheet of paper on which he'd copied the Ten-Point Program.

The freedom of speech of prison inmates is of course limited by the prison's legitimate concerns with security. *Turner v. Safley*, 482 U.S. 78 (1987). The plaintiff argues that possession of a copy of the Ten-Point Program can't create a security concern because two of the books that recite the program are in the prison library, inmates are permitted to borrow books from the library, and the third book was one the prison had permitted him to buy. But prison librarians cannot be required to read every word of every book to which inmates might have access to make sure the book contains no incendiary material. There is no reason to think that a librarian or other employee of the prison read cover to cover any of the three books that contain the Ten-Point Program. And even if a librarian read the book and decided that on the whole it was not "gang literature," that decision would not preclude disciplinary proceedings against an inmate who copied incendiary passages from it.

Point 8 of the Ten-Point Program is a call for "freedom for all Black men held in federal, state, county and city prisons and jails." The plaintiff is a black man in a state prison, and the Black Panthers were implicated in many

acts of violence, including murder. Huey Newton himself may have killed a police officer. Hugh Pearson, *The Shadow of the Panther: Huey Newton and the Price of Black Power in America* 145-46 (1995); see also *People v. Newton*, 87 Cal. Rptr. 394 (Cal. App. 1970). Black Panther leader Richard Moore was convicted of shooting two New York police officers. *People v. Moore*, 366 N.E.2d 1330 (N.Y. 1977). Eldridge Cleaver was convicted of assault in a shootout between Black Panthers and Oakland police officers. *Cleaver v. Superior Court*, 594 P.2d 984, 985-86 (Cal. 1979); *In re Cleaver*, 72 Cal. Rptr. 20, 23-24 (Cal. App. 1968). The "Black Panther Coloring Book" depicted children murdering police officers. *Hampton v. Hanrahan*, 600 F.2d 600, 654 (7th Cir. 1979) (dissenting opinion).

The Black Panther Party is history. But the Ten-Point Program could be thought by prison officials an incitement to violence by black prisoners—especially since there is a "New Black Panther Party," active today, which claims descent from the original Black Panthers and like its predecessor both advocates and practices violence. Southern Poverty Law Center, "New Black Panther Party," www.splcenter.org/get-informed/ intelligence-files/groups/new-black-panther-party (visited July 27, 2012); "There Is No New Black Panther Party: An Open Letter From the Dr. Huey P. Newton Foundation," www.blackpanther.org/newsalert.htm (visited same day).

In context, in the book of Newton's writings, point 8 is much less inflammatory than when read in isolation

in the sheet in the plaintiff's cell; for in the book each point is followed by an explanatory passage, and the passage that explains point 8 states innocuously: "We believe that all Black people should be released from the many jails and prisons because they have not received a fair and impartial trial." *To Die for the People*, *supra*, at 5. Indeed, although Newton's book advocates revolution, it could no more be regarded as a criminal incitement than the *Communist Manifesto* could be. But this underscores the difference between a book as a whole and an arguably inflammatory nugget plucked from it.

Not being experts in prison administration, but aware of the security problems in American prisons, judges sensibly defer within broad limits to the judgments of prison administrators. *Florence v. Board of Chosen Freeholders of County of Burlington*, 132 S. Ct. 1510, 1515-16 (2012); *Beard v. Banks*, 548 U.S. 521, 528 (2006); *Overton v. Bazzetta*, 539 U.S. 126, 131-32 (2003) (plurality opinion); *Van den Bosch v. Raemisch*, 658 F.3d 778, 786 (7th Cir. 2011); *Singer v. Raemisch*, 593 F.3d 529, 533-34 (7th Cir. 2010); *Norwood v. Vance*, 591 F.3d 1062, 1066-67 (9th Cir. 2010). The connection between the plaintiff's copying the Ten-Point Program from *To Die for the People* and gang activity may seem tenuous, but the defendants argue that the likeliest reason the plaintiff copied the Ten-Point Program was to show it to inmates whom he hoped to enlist in a prison gang, a local cell as it were of the Black Panthers; the Ten-Point Program would be the gang's charter.

This is merely a supposition, but it is not so implausible that we can dismiss as groundless the prison's concern with the plaintiff's possession of a copy of the Ten-Point Program. That concern is bolstered by a substantial affidavit by the prison's "Gang Coordinator," Bruce C. Muraski. Here are some of the highlights of his affidavit and that of Warden Thurmer:

> In the United States, two main organizations that monitor intolerance and hate groups are the Anti-Defamation League (ADL) and the Southern Poverty Law Center (SPLC) [and they] have deemed the New Black Panther Party as a hate group…. [T]here would be no other purpose . . . in the Ten-Point Program other than recruiting group members and establishing, reinforcing and maintaining an organizational structure for furthering gangs . . . . If left unchecked, the dissemination of a document such as the Ten-Point Program that was seized from the plaintiff could lead to the structuring and organizing of a gang within the institution and represent a threat to the security, orderly operation, discipline or safety of the institution . . . . Isolating the Ten-Point Program from these library books allows it to be taken out of context, easily circulated and simultaneously possessed by gang members and changed or adopted for the specific needs and activities of the group . . . . [I]nmate Darius Hopkins…was alleged to have unsanctioned security threat group items in his cell, . . . [including] a handwritten paper titled 'Notes on African American Leaders.' This sheet of paper contained the 10-Point Program, which was identical in content to the 10-Point Program found in Toston's cell on July 15, 2009 . . . .

Warden Thurmer believed that Hopkins attempted to disguise the handwritten Ten-Point Program that was found in his possession by placing a title on the paper making it appear to be a historical writing. Since Hopkins had other materials in his cell related to unsanctioned groups, it could be concluded that Hopkins' intent in possessing the Ten-Point Program was also gang/unsanctioned group-related . . . . Hopkins received 210 days of disciplinary separation . . . . Hopkins is an identified member of the Almighty Black P. Stones, which is also an unsanctioned group.

At least a third of the inmate population of the prison is affiliated with gangs and the plaintiff himself is believed to be a member of the Gangster Disciples.

Confiscating the plaintiff's copy of the Ten-Point Program limited free speech only very slightly. Freedom of speech does imply freedom to read. *Stanley v. Georgia*, 394 U.S. 557, 565 (1969); *King v. Federal Bureau of Prisons*, 415 F.3d 634, 638 (7th Cir. 2005) ("forbid a person to read and you shut him out of the marketplace of ideas and opinions that it is the purpose of the free-speech clause to protect"). But does it also imply freedom to copy? That freedom is limited by copyright law and by norms against plagiarism, without the law or the norms being thought to present First Amendment issues. Freedom of speech is not absolute, and the curtailment challenged in this case is slight and the justification adequate, though not ample.

The plaintiff's due process claim, to which we now turn, is that the prison should have notified inmates

that they were not to copy certain passages from books they checked out from the prison library; for the plaintiff could not have anticipated that copying was forbidden. The reference to "gang literature" in the Wisconsin Administrative Code would not have alerted him to the unlawfulness of copying the Ten-Point Program from a book he was permitted to buy. There is no evidence, only suspicion, that his motive in copying the Ten-Point Program was gang-related.

A deprivation of liberty without fair notice of the acts that would give rise to such a deprivation violates the due process clause, but was there a deprivation of liberty? A sanction of segregated confinement means moving an inmate from the general prison population to the near equivalent of solitary confinement. That is a change in the character rather than length of confinement, and is unlikely to be deemed a deprivation of liberty (the inmate having already been lawfully deprived of his liberty) unless the period of segregated confinement is protracted, *Rowe v. DeBruyn*, 17 F.3d 1047, 1053-54 (7th Cir. 1994); *Williams v. Fountain,* 77 F.3d 372, 374 n. 3 (11th Cir. 1996), or the conditions in segregation unusually harsh. E.g., *Wilkinson v. Austin*, 545 U.S. 209, 221-24 (2005); *Marion v. Columbia Correctional Institute*, 559 F.3d 693, 696-99 (7th Cir. 2009); *Lekas v. Briley,* 405 F.3d 602, 610-13 and n. 7 (7th Cir. 2005). The district judge made no findings that would enable an inference that the plaintiff's 90-day sentence to segregation was, or was not, a deprivation of liberty within the meaning of the cases. So while affirming the grant of summary judgment in favor of the defendants with regard to the plaintiff's

free-speech claim, we vacate the dismissal of his due process claim and remand the case for further proceedings concerning it.

AFFIRMED IN PART,
VACATED AND REMANDED IN PART.