NONPRECEDENTIAL DISPOSITION
To be cited only in accordance with
Fed. R. App. P. 32.1

# United States Court of Appeals

**For the Seventh Circuit**
**Chicago, Illinois 60604**

Submitted March 19, 2014[*]
Decided May 1, 2014

**Before**

RICHARD A. POSNER, *Circuit Judge*

MICHAEL S. KANNE, *Circuit Judge*

JOHN DANIEL TINDER, *Circuit Judge*

No. 13-2844

| | |
|---|---|
| GLENN T. TURNER, | Appeal from the United States District |
| *Plaintiff-Appellant,* | Court for the Western District of Wisconsin. |
| | |
| *v.* | No. 11-cv-708-bbc |
| | |
| WILLIAM POLLARD, et al., | Barbara B. Crabb, |
| *Defendants-Appellees.* | *Judge.* |

**O R D E R**

Glenn Turner, a prisoner at the Secure Program Facility in Boscobel, Wisconsin, appeals the grant of summary judgment for the defendants in his civil-rights suit. Turner alleges that, in violation of the First Amendment, prison officials punished him for possessing a copy of the "Willie Lynch Letter" (a speech promoting slavery) and for organizing activities that prison officials deemed gang-related. He also contends that a

---

[*] After examining the briefs and the record, we have concluded that oral argument is unnecessary. Thus, the appeal is submitted on the briefs and the record. *See* FED. R. APP. P. 34(a)(2)(C).

prison official violated the Eighth Amendment by encouraging other inmates to attack him. Because the restrictions on Turner's use of the letter and organizing activities were reasonably related to the prison's legitimate interest in security, we affirm the judgment on that claim. But Turner provided sufficient evidence that a prison official intentionally and significantly heightened the risk that another inmate would attack him, making nominal and punitive damages as well as injunctive relief available to him, so we vacate the dismissal of that claim and remand for further proceedings.

We present the evidence in the light most favorable to Turner. *Diaz v. Kraft Foods Global, Inc.*, 653 F.3d 582, 584 (7th Cir. 2011). According to the affidavit of Lieutenant William Swiekatowski, three inmates came to him and told him that Turner was a leader in the Gangster Disciples. The informants asserted that Turner assigned positions in the gang to other inmates, led gym workouts for gang members (which a review of a security video confirmed), solicited dues for membership in the gang, and ordered "hits" on other inmates.

Acting on these tips, Swiekatowski searched Turner's cell and found copies of the "Willie Lynch Letter" and "William Lynch Update." The Letter purports to record a 1712 speech by a slave owner explaining how to control black slaves by pitting them against each other. (Although its provenance is not at issue, historians have concluded that it is a fake, written in the Twentieth Century. Manu Ampim, *Death of the Willie Lynch Speech* (2005), http://manuampim.com/lynch_hoax1.html; William Jelani Cobb, *Question of the Month: Is Willie Lynch's Letter Real?* (May 2004), http://www.ferris.edu/htmls/news/jimcrow/question/may04.htm.) The Update is written by someone claiming to be a descendant of Lynch. It asserts that corporations now financially exploit blacks' "ignorance," "greed," and "selfishness."

Inmates have used the Letter to incite prison conflict. Captain Patrick Brant, specially trained and experienced in prison-gang issues, explained in an affidavit that the Willie Lynch Letter "has been used by militant leaning African American inmates" as "a tool to incite others to action against the [prison] administration or the United States." Inmate instigators use the Letter to suggest "that the 'white man's' thinking hadn't changed much since 1712," that "Wisconsin prisons were no more tha[n] latter day plantations," and that "prison officials were attempting to control them by a divide and conquer mentality." They therefore "urged African American inmates to resist the attempts of the 'white man' (prison authorities) to keep them under control." Though he had not encountered the Update before this case, Brant judged it "also extremely

racially inflammatory." He concluded that the Willie Lynch materials "present a danger to institutional security and order."

Lieutenant Swiekatowski also found in Turner's cell an essay that Turner had written titled "Failure to Comply with Allah's Rules and Regulations." The essay extends greetings to "the true and living God's and Earth's of the 5% Nation of Islam." Swiekatowski thought that this passage referred to an offshoot of the Nation of Islam called "The Five Percenters" or "The Nation of Gods and Earths." The offshoot teaches that an enlightened five percent of the population are themselves gods. *See generally Fraise v. Terhune*, 283 F.3d 506, 511–12 (3d Cir. 2002) (outlining history and beliefs of group). Captain Brant attests that, although the prison sanctions the Nation of Islam as a religious group, the Five Percenters are an unsanctioned "Black Supremacist organization with a history of violence, especially in the prison setting." *See also id.* at 512–13, 516–17 (recounting violent confrontations between Five Percenters and guards and other inmates in New Jersey prison system and concluding that members of the group "present a serious security threat"); *In re Long Term Admin. Segregation of Inmates Designated as Five Percenters*, 174 F.3d 464, 466–67, 469–70 (4th Cir. 1999) (same for Five Percenters in South Carolina prisons).

Swiekatowski confiscated the Willie Lynch documents and the Five Percenter essay from Turner's cell, and investigated matters further. He knew that Turner had given a cryptic command to an inmate in a neighboring cell to have "Jew boy" "holler" at "Johnny Mac." In light of Turner's command, Lieutenant Swiekatowski searched that inmate's cell. There he found a letter addressed to "Diamond" (an alias of Turner's) and enclosed photographs of other prisoners. The letter was signed "Waiting to hear from you, in the vision, your brother, our struggle." Swiekatowski thought that this last phrase referred to the "Brothers of the Struggle," a name for male members of the Gangster Disciples. Swiekatowski confiscated the letter and photos. He also interviewed inmates, asking them whether Turner had put "hits" out on them. Turner furnished the affidavit of one of these prisoners, Benny Choice, who states that Swiekatowski encouraged him to "initiate a fight" with Turner "in exchange for a placement in better conditions of confinement" and dismissal of an unrelated battery charge.

Turner was charged with violating WIS. ADMIN. CODE DOC § 303.47(2)(a) (prohibiting inmates from keeping items excluded from the prison's published list of permissible possessions) for possessing the "Willie Lynch" materials. He was also charged with violating § 303.20(3) (banning activities and literature associated with unsanctioned gangs) for writing the Five Percenter essay and leading Gangster

Disciples meetings in the gym. After a disciplinary hearing, Turner was found guilty of both charges and was punished with 360 days in "disciplinary separation" and the destruction of the confiscated "contraband." (The photos and letter addressed to "Diamond" were introduced as evidence, but prison officials did not cite them as the basis for the discipline.)

Turner sued Lieutenant Swiekatowski and other prison officials under 42 U.S.C. § 1983, advancing two principal claims relevant to this appeal. First, he contends that his punishment for possessing the "Willie Lynch" and Five Percenter documents and for organizing fellow inmates in the gym violated the First Amendment. Second, Turner maintains that Swiekatowski tried to incite other prisoners to attack him, in violation of the Eighth Amendment, by insinuating through his interview questions that Turner had placed "hits" on inmates and by provoking inmates to fight him.

Both parties moved for summary judgment, and the district court granted the defendants' motion. The court concluded that Turner's punishment for possessing the Willie Lynch materials and the Five Percenter essay did not violate the First Amendment because the punishment was reasonably related to the prison's legitimate goals of preventing racial tension and violence. Similarly, the court continued, based on Turner's gang-recruiting efforts in the gym, prison officials could discipline him for participating in unsanctioned gang activity. Finally, the court rejected Turner's Eighth Amendment claim because he provided no evidence that he had suffered any actual harm. (The district court also rejected another claim: Turner challenged the prison's authority to punish him for possessing the letter addressed to "Diamond" and photos of other inmates, both of which were found in another inmate's cell. But nothing in the record shows that he was punished for possessing them, so the district court properly rejected this claim, and we need say nothing further about it.)

Turner's appeal challenges the dismissal of his First and Eighth Amendment claims, and we begin with the First Amendment claim. Restrictions on prisoners' speech are constitutional if they are reasonably related to legitimate penological interests. *Turner v. Safley*, 482 U.S. 78, 89 (1987). In reviewing restrictions on prisoner expression, we generally defer to the professional judgment of prison administrators about the effect of inmate speech on prison safety. *Overton v. Bazzetta*, 539 U.S. 126, 132 (2003). We have thus allowed prison officials to suppress material or activities that they reasonably believe encourages unrest and disrespect of staff, *Van den Bosch v. Raemisch*, 658 F.3d 778, 788 (7th Cir. 2011) (banning newsletter that accused parole commission of manipulating and lying to inmates), promotes the tenets of groups with violent

histories, *Toston v. Thurmer*, 689 F.3d 828, 830–31 (7th Cir. 2012) (banning possession of Black Panther's Ten-Point Program, calling for freedom of all blacks in prison), and advances activities that mimic gang structures, *Singer*, 593 F.3d at 535–38 (banning role-playing games that could foster gang behavior).

The defendants' unrebutted affidavits establish that Turner's written materials and gym-based recruitment threatened to promote unrest, violence, and unsanctioned gang activity. Captain Branch's affidavit substantiates that Turner's Willie Lynch documents encourage upheaval and disrespect of white prison staff. The affidavit also shows that the Five Percenters, for which prison officials reasonably believed Turner's essay showed an affinity, have a history of advocating violence in prisons. *See also Fraise*, 283 F.3d at 516–17; *Five Percenters*, 174 F.3d at 469–70. Likewise, Lieutenant Swiekatowski's affidavit and the corroborating video recording establish that Turner led the gym-based gatherings to organize members and solicit money for the Gangster Disciples. In light of our deference to prison officials, these affidavits about the security threats posed by Turner's materials and activities suffice to support the prison's disciplinary decision. *See Van den Bosch*, 658 F.3d at 787–88; *Toston*, 689 F.3d at 831.

Turner offers three replies, but none is availing. First, he argues that at various times prison officials have offered different rationales to justify disciplining him, and he contends that these variations cast doubt on the sincerity of all of them. But our limited inquiry—whether a proffered institutional interest (here, security) justifies the discipline—is objective; the inquiry does not depend on the sincerity of the prison officials' motives for restricting speech. *Hammer v. Ashcroft*, 570 F.3d 798, 803 (7th Cir. 2009) (en banc); *see also Singer v. Raemisch*, 593 F.3d 529, 536 (7th Cir. 2010). Second, Turner insists that the feared violence from the Lynch documents and his Five Percenter materials is "exaggerated" since violence has not yet occurred. But an actual disturbance is not required; a reasonable worry of a potential threat is sufficient. *Van den Bosch*, 658 F.3d at 788–90; *Singer*, 593 F.3d at 536. Third, Turner observes that the content in the Willie Lynch documents is contained in books in the prison library, so he should not be faulted for possessing them. But even if prison library books contain these documents (though Turner offered no evidence to support his assertion), prisons may still punish possession of incendiary passages from their library books:

> [P]rison librarians cannot be required to read every word of every book to which inmates might have access to make sure the book contains no incendiary material. . . . And even if a librarian read the book and decided

that on the whole it was [acceptable,] that decision would not preclude
disciplinary proceedings against an inmate who copied incendiary
passages from it.

*Toston*, 689 F.3d at 829–30; *see also Munson v. Gaetz*, 673 F.3d 630, 636–37 (7th Cir. 2012);
*Mays v. Springborn*, 575 F.3d 643, 649 (7th Cir. 2009). Accordingly, the district court
properly granted summary judgment on the First Amendment claims.

We now address Turner's Eighth Amendment claim and conclude that the
availability of equitable relief requires that we vacate the grant of summary judgment.
The district court granted summary judgment because, although Turner supplied
evidence that Swiekatowski urged inmates to attack him, he offered no evidence that he
had yet been physically harmed in any way. It is true that, under the Prison Litigation
Reform Act, without an accompanying physical injury, a court may not award
compensatory damages for non-physical harm, such as fear of attack. *See* 42 U.S.C.
§ 1997e(e); *Thomas v. Illinois*, 697 F.3d 612, 614–15 (7th Cir. 2012). But where, as in this
case, the record supports an inference that a prison official is deliberately exposing an
inmate to a dangerous risk, the inmate may seek an injunction against exposure to the
risk. *See Farmer v. Brennan*, 511 U.S. 825, 831, 845–87 (1994) (recognizing availability of
injunctive relief when transsexual prisoner placed in general population with history of
sexual assaults); *Helling v. McKinney*, 509 U.S. 25, 33–34 (1993) (recognizing availability
of injunctive relief when prisoner exposed to second-hand smoke). Indeed, in his
complaint Turner asks for different lodging because "he fears for his life and safety in
the custody and care of defendants." Given the request for and possibility of equitable
relief, summary judgment was inappropriate on this claim.

Although compensatory damages are unavailable, summary judgment was also
inappropriate because, given the substantial danger to which Swiekatowski allegedly
exposed Turner, Turner may be eligible for nominal or punitive damages. *See Thomas*,
697 F.3d at 614–15 (explaining that nominal and punitive damages are available due to
"hazard, or probabilistic harm" even in absence of physical or psychological harm);
*Smith v. Peters*, 631 F.3d 418, 421 (7th Cir. 2011) ("Prison officials who recklessly expose
a prisoner to a substantial risk of a serious physical injury violate his Eighth
Amendment rights, [and may be liable for] nominal and . . . punitive damages.");
*Calhoun v. DeTella*, 319 F.3d 936, 941–42 (7th Cir. 2003) ("[W]e have approved the award
of nominal [and punitive] damages for Eighth Amendment violations when prisoners
could not establish actual compensable harm."). Punitive damages would require proof
that Swiekatowski was "motivated by evil motive or intent" or "reckless or callous

indifference" to Turner's constitutional rights. *Smith v. Wade*, 461 U.S. 30, 56 (1983); *see also Calhoun*, 319 F.3d at 942. This matches the standard for Turner's underlying Eighth Amendment claim that Swiekatowski deliberately endangered Turner's safety. *See Woodward v. Corr. Med. Servs. of Ill., Inc.*, 368 F.3d 917, 930 (7th Cir. 2004) (noting that culpability required for § 1983 liability is same as punitive damage standard); *Walsh v. Mellas*, 837 F.2d 789, 801–02 (7th Cir. 1988) (same).

Accordingly, the judgment is AFFIRMED in all respects except for Turner's Eighth Amendment claim against Swiekatowski, as to which the judgment is VACATED and REMANDED for further proceedings consistent with this order.