In the

# United States Court of Appeals
## For the Seventh Circuit

No. 06-1750

DAVID PAUL HAMMER,

*Plaintiff-Appellant,*

*v.*

JOHN D. ASHCROFT, *et al.*,

*Defendants-Appellees.*

Appeal from the United States District Court
for the Southern District of Indiana, Indianapolis Division.
No. IP 01-558-C-T/G—**John Daniel Tinder**, *Judge.*

ARGUED NOVEMBER 26, 2007—DECIDED JANUARY 15, 2008

Before BAUER, ROVNER, and WOOD, *Circuit Judges.*

ROVNER, *Circuit Judge.* David Hammer, a federal prisoner on death row, sued various Bureau of Prisons ("BOP") officials alleging that they violated his First Amendment and equal protection rights by implementing and enforcing a policy that prevents him from giving face-to-face interviews with the media and from talking with the media about other inmates. The current defendants—the former Attorney General of the United States, John Ashcroft; a former BOP Director, Kathleen Hawk-Sawyer; and former wardens of the federal prison in Terre Haute, Indiana, Harley Lappin and Keith Olson—moved for summary judgment, arguing that the challenged policy is rationally related to legitimate penological interests.

The district court granted the defendants' motion, and Hammer appeals. Because we conclude that Hammer raised a genuine issue of fact as to whether the defendants' proffered justification for the policy banning face-to-face interviews is pretextual, we reverse and remand.

## I. Background

In July 1999 the BOP opened the Special Confinement Unit ("SCU") at the federal prison in Terre Haute, Indiana, to house male inmates sentenced to death by the federal courts. The SCU also houses inmates who are not under a death sentence, but who are considered to be on "administrative detention status." Hammer—who was under a federal death sentence for killing his cellmate—was among the first inmates transferred to the SCU.[1]

Between August and December 1999, Hammer gave three face-to-face interviews with members of the media in the SCU's non-contact visiting area. No security problems arose as a result of these interviews. But in late December 2000, Lappin ordered Hammer not to provide information to members of the media about other inmates. When Hammer asked Lappin for clarification, he stated that Hammer was "prohibited from disclosing to a media representative any information about another inmate through any manner of communication (oral, written, etc.)." Just over a month later, the BOP disciplined

---

[1] Hammer's death sentence has been vacated, *see United States v. Hammer*, 404 F.Supp.2d 676 (M.D. Pa. 2005)—a decision the government is challenging in the Third Circuit Court of Appeals, *see United States v. Hammer*, No. 06-9001. Although Hammer is no longer under a death sentence, Hammer's counsel informed us during oral argument—and the appellees do not dispute—that he is still housed on death row at the SCU and is still subject to the challenged policy.

Hammer for providing information about a fellow death row inmate to a reporter. Lappin did not, however, generally prohibit Hammer from giving face-to-face interviews.

That situation changed a few months later. In March 2000, CBS aired a national broadcast of "60 Minutes" featuring an interview with Timothy McVeigh. At that time McVeigh was housed at the SCU awaiting execution for his role in the 1995 bombing of the Alfred P. Murrah federal building in Oklahoma City. Following this interview, U.S. Senator Byron Dorgan wrote to BOP Director Hawk-Sawyer on March 14, 2000, criticizing the BOP for allowing the McVeigh interview and demanding that the BOP prohibit similar interviews with other death row inmates. The published account of this criticism described Dorgan's view of the value of such interviews:

> The American people have a right to expect that the incarceration of a convicted killer will not only remove him physically from society, but will also prevent him from further intrusion in our lives through television interviews and from using those forums to advance his agenda of violence.

Soon thereafter Lappin (then the SCU warden) denied every media request for a face-to-face interview with Hammer. When Hammer filed an administrative grievance to protest these denials, Lappin informed him that the procedures for granting interviews "have evolved" since the SCU opened and that requests for in-person media interviews are evaluated on "a case-by-case basis."

The policy on face-to-face interviews evolved further one month later. On April 12, 2001, Ashcroft and Hawk-Sawyer gave a press conference during which they announced a change from the case-by-case policy to a blanket policy preventing SCU inmates from having face-to-face interviews with members of the media on any subject at

any time. The policy allows SCU inmates to speak to the media only by telephone during their ordinary 15-minute daily allotment of telephone time. In announcing this policy, Ashcroft explained that it is designed to prevent murderers from, in his view, altering our culture by glamorizing violence:

> I am aware that several media outlets have requested access to interview inmate McVeigh. As an American who cares about our culture, I want to restrict a mass murderer's access to the public podium. On an issue of particular importance to me as Attorney General of the United States, I do not want anyone to be able to purchase access to the podium of America with the blood of 168 innocent victims.
>
> ***
>
> I'm concerned about irresponsible glamorization of a culture of violence, and that concern has shaped our approach to these issues profoundly.

Hawk-Sawyer announced that the 15-minute telephone limitation "will become the policy for the [SCU] in general."

Three days after the press conference, Lappin signed Institution Supplement 1480.05A ("the media policy"), which states that "[t]o maintain safety, security and the good order of the SCU, in-person interviews (including video-recorded interviews) will not be permitted." To gain permission for a 15-minute telephone interview under the new media policy, members of the press must agree that they will not ask an SCU inmate any questions about other federal or state prisoners. And members of the press must agree not to publish any information that an SCU inmate volunteers about other prisoners. All parties agree that the media policy does not apply to all SCU inmates—it applies only to those SCU inmates who have been sentenced to the death penalty.

Hammer sued the defendants under *Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics*, 403 U.S. 388 (1971), alleging that the media policy's ban on in-person interviews and discussions about other inmates violated his First Amendment and equal protection rights. The district court dismissed the complaint under the Prison Litigation Reform Act, 28 U.S.C. § 1915A(b)(1), but we reversed, finding that Hammer's allegations—specifically, that the defendants implemented the media policy to prevent death row inmates from speaking publicly rather than to further security concerns—stated a claim, *see Hammer v. Ashcroft, et al.*, 42 Fed. App'x 861, 863 (7th Cir. 2002).

After we remanded the case, Hammer moved three times for the court to recruit counsel on his behalf. The district court denied each motion. Hammer also filed three requests for discovery, but instead of responding to those requests, the defendants moved for summary judgment a full month before the close of discovery. Only after filing their summary judgment motion did the defendants respond to Hammer's discovery requests by objecting to them all. Hammer filed a motion for a continuance under Federal Rule of Civil Procedure 56(f), arguing that he needed additional time to procure discovery from the defendants. He also filed a brief opposing the motion for summary judgment. The court entered an order granting the continuance "to the extent that his filings in this action . . . shall be deemed to have been timely made," but it denied Hammer any extension of time to conduct further discovery.

In support of the defendants' motion for summary judgment, Lappin submitted a declaration purporting to justify the SCU's media policy. He explained that broadcasting face-to-face interviews of inmates can create "jailhouse celebrities," giving them heightened status among the inmates and leading to security breaches.

He also explained that it was necessary to restrict inmates from discussing other inmates with the media to prevent privacy breaches or "real or imagined slights, insults or provocations" that could inflame tensions in the SCU. In his response, Hammer argued that Lappin's articulated security rationale for the ban on face-to-face interviews was "a guise" to cover up "the real reason" behind the ban—anger over the McVeigh interview and the resulting outrage over death row inmates speaking to a national audience. The court granted the defendants' motion for summary judgment, stating that the media policy is reasonably related to legitimate penological interests.

## II. Analysis

On appeal Hammer argues that the SCU's media policy preventing death row inmates from giving face-to-face interviews with the media violates his equal protection, First Amendment, and procedural due process rights. Specifically, he argues that the media policy treats death row inmates differently from all other federal inmates based on an untested assumption that giving death row inmates access to the media poses a categorically heightened security risk. Hammer also asserts that he submitted evidence sufficient to show that the media policy was passed for the impermissible reason of preventing death row inmates from speaking publicly, and not to further security interests. He also argues that the manner in which the BOP adopted the media policy deprived him of due process. Finally, Hammer challenges the district court's denial of his three motions for counsel and his Rule 56(f) motion for a continuance.

**A. Constitutional Claims**

We review *de novo* the district court's grant of summary judgment for the defendants on Hammer's constitutional challenges to the media policy. *See Steen v. Myers*, 486 F.3d 1017, 1021 (7th Cir. 2007). Inmates retain constitutional rights that are consistent with incarceration; those rights include access to the media. *See Turner v. Safley*, 482 U.S. 78, 84 (1987); *Pell v. Procunier*, 417 U.S. 817, 827-28 (1974). But recognizing the deference owed to the administrative judgment of prison officials, the Supreme Court has held that a prison regulation infringing on an inmate's constitutional rights is valid if "it is reasonably related to legitimate penological interests." *Turner*, 482 U.S. at 89. Accordingly, a prison regulation that restricts an inmate's access to the media will be upheld if there is a "valid, rational connection between the prison regulation and the legitimate governmental interest put forward to justify it." *Id.* (quotation marks omitted). Other relevant factors include whether the regulation leaves open alternative means of exercising the right; the impact accommodation would have on other inmates, guards, and prison resources; and whether there are obvious, easy alternatives to the restriction. *Id.* at 89-90; *see also Lindell v. Frank*, 377 F.3d 655, 657 (7th Cir. 2004).

Hammer argues that we should apply strict scrutiny to his equal protection claim, rather than the *Turner* analysis, because he maintains that *Turner* applies only to policies that affect all inmates within a prison equally or that apply temporarily to individual inmates in response to a disciplinary infraction. Hammer argues that strict scrutiny should apply here because the media policy arbitrarily deprives death row inmates of First Amendment freedoms that other federal prisoners enjoy—namely, face-to-face media access. But the Su-

preme Court has held that the *Turner* analysis "applies to all circumstances in which the needs of prison administration implicate constitutional rights." *Washington v. Harper*, 494 U.S. 210, 224 (1990); *see also Russell v. Richards*, 384 F.3d 444, 447 (7th Cir. 2004). Post-*Turner*, the Supreme Court applies strict scrutiny only to prison regulations involving suspect classifications such as race. *See, e.g.*, *Johnson v. California*, 543 U.S. 499, 505 (2005). Federal inmates on death row are not a suspect class. *Cf. Pryor v. Brennan*, 914 F.2d 921, 923 (7th Cir. 1990). Accordingly, courts have declined to apply heightened scrutiny in cases involving equal protection challenges to prison regulations that implicate First Amendment rights, *see, e.g., Williams v. Lane*, 851 F.2d 867, 881 (7th Cir. 1988); *Taylor v. Johnson*, 257 F.3d 470, 474 (5th Cir. 2001); *Morrison v. Garraghty*, 239 F.3d 648, 654-55 (4th Cir. 2001), even where the regulations distinguish among groups of inmates within a prison, *see DeHart v. Horn*, 227 F.3d 47, 61 (3d Cir. 2000); *Benjamin v. Coughlin*, 905 F.2d 571, 575 (2d Cir. 1990). Thus we view Hammer's equal protection and First Amendment claims through the *Turner* lens.

Turning then to the first prong of the *Turner* analysis and Hammer's First Amendment claim, we ask whether a valid, rational connection exists between the media ban on face-to-face interviews and the cited security interest. *See Turner*, 482 U.S. at 89. No such connection exists if the purpose of the policy is to suppress the content of the restricted message. *See id.* at 90. And the penological interest that the prison officials invoke in court to justify the restriction must have actually motivated them at the time they enacted or enforced the restriction; the invoked interests fail under *Turner* if they are a pretext for an illegitimate, content-specific motivation. *See Salahuddin v. Goord*, 467 F.3d 263, 276-77 (2d Cir. 2006) (holding that prison officials must show

that they "actually had, not just could have had, a legitimate reason for burdening protected activity" to survive summary judgment); *Abu-Jamal v. Price*, 154 F.3d 128, 134 (3d Cir. 1998) (noting that a prison rule is "not content neutral as required by *Turner*" if it is enforced at least in part due to public pressure rather than security concerns); *Quinn v. Nix*, 983 F.2d 115, 118 (8th Cir. 1993) (stating that "[p]rison officials are not entitled to the deference described in *Turner* . . . if their actions are not actually motivated by legitimate penological interests at the time they act."); *Walker v. Sumner*, 917 F.2d 382, 386-87 (9th Cir. 1990) (holding that where a prisoner alleges that a policy is enforced for a "dubious purpose" officials must demonstrate that the asserted penological interests "are the actual bases for their policies"); *Baraldini v. Thornburgh*, 884 F.2d 615, 620 (D.C. Cir. 1989) (noting that "[a] reviewing court must always be careful to make certain that prison administrators are not pretextually using alleged concerns in order to punish an inmate for his or her political or other views.").

Here, Hammer submitted evidence suggesting that the driving force behind the ban on face-to-face interviews was not a security concern, but rather outrage over McVeigh's message and a desire to prevent other death row inmates from expressing their views about themselves or their fates and thereby influencing "our culture." For example, without any concerns about security breaches Lappin allowed Hammer face-to-face media interviews until the McVeigh interview aired; after that (and after a senator's written protest to the BOP about such broadcasts) Lappin denied all media requests for face-to-face interviews with Hammer. Most significantly, in unveiling the blanket restriction on face-to-face interviews with death row inmates, Ashcroft—with Hawk-Sawyer at his side—explained that he wanted to deny such inmates a platform from which they could spread their "irresponsi-

ble glamorization of a culture of violence." This is evidence from which a jury could conclude that when Aschroft's subordinate Lappin implemented the restriction at the SCU just three days later, the defendants desired to control a disfavored message rather than to secure the SCU.

The defendants argue that this evidence amounts to nothing more than "a coincidence of timing." But the evidence is more than just timing. Ashcroft explained that his distaste for the content of interviews given by death row inmates was the reason for the policy. That is direct evidence of the actual motivation, and it creates a genuine issue of material fact as to whether Lappin was motivated by a desire to prohibit a disagreeable viewpoint or to advance prison security.

The defendants also argue that we must defer to Lappin's judgment that the challenged policy is needed to combat the problem of jailhouse celebrities. But in reviewing a grant of summary judgment we must be careful to distinguish between matters of prison administration—on which we give substantial deference to prison officials' professional judgment—and matters of disputed fact on issues like motivation—on which we draw inferences in favor of the non-moving party. *See Beard v. Banks*, 126 S.Ct. 2572, 2578 (2006). If an inmate submits evidence showing that the penological interests invoked by prison authorities are pretextual, the policy is not neutral and fails under *Turner*. *See Abu-Jamal*, 154 F.3d at 134. Hammer submitted evidence from which a reasonable jury could conclude that the media policy was implemented and is now enforced not because of safety concerns, but rather in response to public pressure to prevent death row inmates from voicing their views publicly. Accordingly, summary judgment is inappropriate on Hammer's First Amendment challenge to the ban on face-to-face interviews based

on the first *Turner* factor. *See Salahuddin*, 467 F.3d at 276-77.

Summary judgment on the First Amendment claim was also inappropriate as to two other *Turner* factors because Hammer has cast doubt on whether the media policy leaves open sufficient alternate routes of access to the media and whether there are reasonable alternatives to the ban on face-to-face interviews. *See Turner*, 482 U.S. at 90. For example, Lappin's justification for the ban on face-to-face interviews is that the *broadcast* of inmate interviews creates the risk of jailhouse celebrity. The government has not explained why, then, the prison needs to ban face-to-face interviews that are not recorded or broadcast. Moreover, there is a question of material fact whether the ban on discussing other inmates with the media allows Hammer an alternate route for discussing his criminal case. Hammer's goal is to discuss his criminal case (which involves inmate witnesses) with members of the press to highlight his disagreement with the prosecution. But he is subject to discipline if he engages in those discussions. Thus there is a question of material fact as to whether the policy leaves open *any* meaningful way for Hammer to access the media to discuss his case. *Cf. Pell*, 417 U.S. at 827-28.

Turning to Hammer's equal protection claim, we note that the district court gave this claim short shrift, stating only that the media policy applies equally to all inmates housed in the SCU. But this ignores Hammer's evidence that the media policy applies only to SCU inmates under a death sentence, a fact that the defendants do not dispute on appeal. And Hammer's evidence of pretext also casts doubt on whether the defendants had a valid interest in treating death row inmates differently from all other federal inmates. The equal protection clause prohibits the government from making distinctions among groups of speakers based on the content of their

speech. *See, e.g.*, *Police Dep't of Chi. v. Mosley*, 408 U.S. 92, 96 (1972). Here, Ashcroft said that his concern about the "glamorization of violence" in American culture shaped the BOP's approach to the SCU-specific ban on death row inmates giving face-to-face interviews. A reasonable jury could thus conclude that death row inmates are treated differently not because they are disproportionately likely to become jailhouse celebrities or inflame tensions with other inmates, but because the policy makers believed that death row inmates are disproportionately likely to promote a "glamorization of violence." Accordingly, the defendants are not entitled to summary judgment on Hammer's equal protection claim.

The district court did not address what Hammer now argues is a claim that the defendants violated his due process rights by adopting the media policy without offering him notice or the opportunity to comment. But the court did not address this claim because Hammer did not make it; nothing in his complaint or opposition to summary judgment would have put the defendants or the court on notice that he objected to the process through which the policy was adopted. Because Hammer's purported due process claim is outside the scope of the court's grant of summary judgment for the defendants, we need not address it here.

We note that it can be an easy thing for an inmate to allege that prison officials are lying about the rationale behind a prison restriction; it is only because Hammer has backed up his allegations with admissible evidence from which a reasonable jury could infer that an illegitimate reason lies behind the interview ban that his First Amendment and equal protection claims survive summary judgment.

**B.  Personal Involvement**

The district court granted summary judgment for Ashcroft and Hawk-Sawyer because, in its view, they had no personal involvement in the events underlying the allegations. A supervisory defendant is personally involved in and liable for a constitutional violation if he "create[s] a custom or policy fostering the violation or allow[s] the custom or policy to continue after learning of it." *Thomas v. Ashcroft*, 470 F.3d 491, 496-97 (2d Cir. 2006). Ashcroft's and Hawk-Sawyer's participation in the press conference in which they called for the BOP ban on face-to-face interviews raises a triable issue of whether they fostered the ban for the purpose of suppressing expression. *See Whitford v. Boglino*, 63 F.3d 527, 531 (7th Cir. 1995). Thus summary judgment on the basis of their non-involvement was unwarranted.

Before addressing Hammer's procedural challenges to the district court's decision, we note two issues that the district court may address on remand. Hammer has sued the defendants in their individual and official capacities for damages, and for injunctive and declaratory relief. The defendants may be entitled to qualified immunity from damages, but given the unresolved issues of fact, we leave that determination to the district court in the first instance. Hammer's claim for injunctive relief against the defendants in their individual capacities is now moot because none of the defendants currently hold the positions in which they were sued. But pursuant to Federal Rule of Appellate Procedure 43(c)(2) and Federal Rule of Civil Procedure 25(d), the district court should substitute the current officeholders for the official-capacity claims and consider which of them are proper defendants for injunctive relief under *Ex Parte Young*, 209 U.S. 123, 157 (1908) (requiring a "special relation" between the public official sued and the challenged rule).

**C. Denial of Motions for Counsel and for a Continuance**

Hammer also argues that the district court erroneously denied his three motions to recruit counsel and his Rule 56(f) motion for a continuance. We review the district court's rulings on these motions for abuse of discretion. *See Johnson v. Doughty*, 433 F.3d 1001, 1006 (7th Cir. 2006); *Davis v. G.N. Mort. Co.*, 396 F.3d 869, 885 (7th Cir. 2005). In resolving a motion for the recruitment of counsel, the district court must consider both the complexity of the case and the *pro se* plaintiff's ability to litigate it himself. *Pruitt v. Mote*, 503 F.3d 647, 654-55 (7th Cir. 2007). The court must analyze the plaintiff's capabilities in light of the challenges specific to his case, including "the tasks that normally attend litigation: evidence gathering, preparing and responding to motions and other court filings, and trial." *Id.* at 655. In reviewing a court's decision to deny a motion for counsel, we must ensure that the court meaningfully engaged in the correct analysis, and did not render a decision arbitrarily. *Id.* at 658, 660.

Here, the district court's three orders denying Hammer's requests for counsel do not demonstrate that the court meaningfully considered the complexity of Hammer's claims. Its first order is silent regarding the difficulty of his case. The second two orders state that Hammer "has demonstrated familiarity with his claims and the ability to present them, because the issues presented by his claims are not complex, and because this does not appear to be a case in which the presence of counsel would make a difference in the outcome." But this is nothing more than a restatement of the applicable legal standard, without any reasoning showing that the court actually considered the standard in light of the particulars of Hammer's case. *See id.* at 660.

But we will reverse the district court's decision to deny counsel only on a showing of prejudice, *see id.* at 659, which leads us to Hammer's Rule 56(f) motion for a continuance. Hammer asked for more time to conduct discovery because the defendants moved for summary judgment before the close of discovery and then objected to all of his discovery requests. Because Hammer filed his opposition to summary judgment before the court ruled on his motion, it concluded that he did not need further time for discovery. But the fact that Hammer filed his response before waiting to see if the court would grant the continuance shows only that he made the best of what he had, not that he had a fair opportunity to avail himself of discovery. And nothing in the court's order denying the continuance suggests that it considered the impact that the defendants' premature summary judgment motion had on Hammer's ability to obtain the discovery necessary to defend against the motion.

The appellees now defend the district court's denial of the continuance on the ground that Hammer did not specify what documents he needed time to procure. But that is precisely the kind of failure that could have been cured had the court granted his motion for counsel. The appellees cannot have it both ways—they cannot argue that Hammer has the ability to litigate his own claims and then fault him when he fails to do so with the sophistication of an attorney. We thus conclude that the denial of counsel prejudiced Hammer, and, especially in light of Hammer's *pro se* status, that the court abused its discretion in denying his Rule 56(f) motion for a continuance.

For the reasons set forth above, the district court's decision is REVERSED and REMANDED for further proceedings.

A true Copy:

Teste:

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*