# In the

# United States Court of Appeals

## For the Seventh Circuit

No. 06-1750

DAVID PAUL HAMMER,

*Plaintiff-Appellant,*

*v.*

JOHN D. ASHCROFT, *et al.*,

*Defendants-Appellees.*

Appeal from the United States District Court for the
Southern District of Indiana, Indianapolis Division.
No. IP 01-0558-C-T/G—**John Daniel Tinder**, *Judge.*

ARGUED SEPTEMBER 10, 2008—DECIDED JUNE 25, 2009

Before EASTERBROOK, *Chief Judge*, and BAUER, POSNER,
KANNE, ROVNER, WOOD, EVANS, and SYKES, *Circuit Judges.*[†]

EASTERBROOK, *Chief Judge.* "[N]ewsmen have no con-
stitutional right of access to prisons or their inmates
beyond that afforded to the general public*." Pell v.
Procunier*, 417 U.S. 817, 834 (1974). The Supreme Court

---

[†] Circuit Judges Flaum, Williams, and Tinder did not partici-
pate in the consideration or decision of this appeal.

applied that principle in *Saxbe v. Washington Post Co.*, 417 U.S. 843 (1974), when holding that the Federal Bureau of Prisons did not violate the Constitution by preventing face-to-face interviews between reporters and inmates.

In the years after *Washington Post* the Bureau authorized some in-prison interviews. By the late 1990s reporters could talk to prisoners throughout the federal system. See Program Statement 1480.05 (News Media Contacts) (promulgated Sept. 21, 2000, and in force since). That changed in 2001, however, for inmates housed in some of the Bureau's most-secure locations—including the "Special Confinement Unit" at the prison in Terre Haute, Indiana, which houses most federal prisoners under sentence of death, plus some others in administrative detention for disciplinary or security reasons.

Program statements generally applicable to federal prisons may be modified by institution-specific supplements. See Program Statement 1480.05(13) (applying this exception-making power to media contacts in particular). The Warden of Terre Haute proposed, and the Bureau's Director approved, Institution Supplement THA 1480.05A, which bans person-to-person meetings between reporters and inmates of the Special Confinement Unit, though it allows phone calls and correspondence. (The current revision, THA 1480.05B, contains the same rule; for simplicity we refer only to THA 1480.05A.) Phone calls with reporters are subject to Program Statement 1480.05(7)(d), which provides that "[a] representative of the news media may not obtain and use personal information from one inmate about another inmate

who refuses to be interviewed." Correspondence is unlimited; an inmate's letters to reporters are not subject to inspection or censorship. "All properly identified and labeled correspondence from an inmate who is not on restricted mail status to qualifying representatives of the news media shall be sealed and forwarded without inspection, directly and promptly." Program Statement 5265.11(17)(a) (July 9, 1999).

David Paul Hammer, who was sentenced to death for killing another federal prisoner, contends in this suit under *Bivens v. Six Unknown Federal Narcotics Agents*, 403 U.S. 388 (1971), that he is entitled to money damages from former Attorney General Ashcroft and other public officials who drafted or approved THA 1480.05A. Relying on *Pell* and *Washington Post*, the district court granted summary judgment for the defendants. 2006 U.S. Dist. LEXIS 9306 (S.D. Ind. Feb. 23, 2006). A panel of this court reversed, 512 F.3d 961 (7th Cir. 2008), and that decision was vacated in turn by the order granting defendants' petition for rehearing en banc.

Hammer's attempt to obtain damages has complicated matters. The validity of federal administrative rules usually is resolved in actions under the Administrative Procedure Act seeking prospective relief, not in suits for money against officials whose positions and roles generally entitle them to qualified if not absolute immunity. A district judge held the policy valid, after all. Although the panel thought that, on an enlarged record, Hammer might yet prevail, "[i]f judges . . . disagree on a constitutional question, it is unfair to subject [public

officials] to money damages for picking the losing side of the controversy." *Wilson v. Layne*, 526 U.S. 603, 618 (1999). Accord, *Pearson v. Callahan*, 129 S. Ct. 808, 823 (2009). Indeed, a *Bivens* action is improper when statutes specify how administrative deeds are reviewed. See *Wilkie v. Robbins*, 127 S. Ct. 2588, 2597–2605 (2007). But because we agree with the district court that THA 1480.05A is valid, we sidestep the complications introduced by Hammer's quest for damages. (Hammer's death sentence was set aside in 2005, *United States v. Hammer*, 404 F. Supp. 2d 676 (M.D. Pa. 2005), but he remains in the Special Confinement Unit pending appeal, now under advisement in the Third Circuit, and so has an ongoing interest in the rule's constitutionality. His other sentences exceed 1,200 years' imprisonment, so release is not imminent.)

*Pell v. Procunier* and *Saxbe v. Washington Post* establish that the Bureau of Prisons could enforce a system-wide rule against personal or video interviews between prisoners and reporters. Hammer contends, however, that by curtailing press access to some prisoners but not others, the Bureau offends the equal-protection component of the due process clause in the Constitution's fifth amendment. Yet it is hard to understand why all prisoners should be treated the same. Some are in minimum-security prisons and others in more secure confinement; no one thinks these differences unconstitutional. The Justices observed in *Pell* and *Washington Post* that the principal reason for limiting press contacts is the maintenance of security; this implies that the greater the need for security at a given prison (or unit within a prison), the

easier it is to justify limits on meetings between reporters and prisoners. By the time the Court decided *Washington Post*, the Bureau of Prisons had begun to allow reporters to interview inmates of minimum-security prisons. See 417 U.S. at 844 & n.2. The Justices did not perceive any problem in this distinction. It is easier to justify limiting press contacts at the few places holding the most incorrigible prisoners (USP Florence and the Special Confinement Unit at Terre Haute) than at all medium- and maximum-security prisons.

Hammer's argument amounts to a contention that, once a prison system starts to allow access more liberally, it must go all the way; any intermediate position violates equal-protection principles. That understanding is inconsistent with many established doctrines. For example, thirty years ago a court held that Congress had violated equal-protection limits by subjecting members of the diplomatic service, but not other federal workers, to mandatory retirement. The Justices held, however, that it is possible to draw such lines as long as a rational basis for them may be imagined; the basis need not be supported in the record. *Vance v. Bradley*, 440 U.S. 93 (1979). Just as it was possible to imagine a rational basis for distinguishing diplomats from postal carriers, so it is possible to imagine a rational basis for distinguishing the nation's most secure institutions from others. Indeed, to state the distinction is to furnish the justification: security.

The security justification that carried the day in *Pell* and *Washington Post* was that interviews with the press

make celebrities of some inmates. This increases tensions within prisons (those who don't receive public attention may react with envy); and if some inmates use the press to disparage others (or their beliefs, or the organizations to which they belong), the tensions will be greater. More: the interviewed prisoners get swelled heads and "tend to become the source of substantial disciplinary problems that can engulf a large portion of the population at a prison*." Washington Post*, 417 U.S. at 848–49. Prisons for tax evaders and credit-card forgers may tolerate such tensions; prisons for killers are more explosive, and the need to prevent lighting the fuse to the powder keg is compelling.

Hammer maintains that prisons must use the least-restrictive available options and that the Bureau's experience since *Washington Post* shows that the risks associated with interviews are manageable. This line of argument marks a transition from equal protection to the first amendment, for it incorporates elements of both bodies of doctrine. But this, too, is a tired theme. It has been made in several cases dealing with press interviews and correspondence among prisoners, and the Justices have rejected it. See, e.g., *Thornburgh v. Abbott*, 490 U.S. 401, 409–14 (1989); cf. *Shaw v. Murphy*, 532 U.S. 223 (2001). The question is not whether prisons could find ways to accommodate one or another change. It is whether the rule that the prison chooses to implement is "reasonably related to legitimate security interests*." Turner v. Safley*, 482 U.S. 78, 91 (1987). And the Court has held in *Pell* and *Washington Post* that a no-interview policy *is* "reasonably related to legitimate security interests." The

Justices added that an attempt to be "less restrictive" by making individual decisions could undermine security: "such a selective policy would spawn serious discipline and morale problems of its own by engendering hostility and resentment among inmates who were refused inter-view privileges granted to their fellows." *Washington Post*, 417 U.S. at 849.

Hammer maintains, however, that the Bureau has engaged in content or viewpoint discrimination by silenc-ing inmates on death row. This may well be true of a selective (or "less restrictive") approach; wardens who allow some prisoners but not others to invite the press into their cells might well take account of what they expect the inmates to say or the reporters to relate to the public. But a blanket ban—*no* inmate in a given prison or unit may meet face-to-face with *any* reporter—is neutral with respect to both content and viewpoint. This is one reason why the Justices approved the policies at issue in *Pell* and *Washington Post*, giving the exception-free quality of the policies as proof that the decisions were not based on content. See *Pell*, 417 U.S. at 825–26.

Perhaps Hammer's point is not that the *rule* employs content or viewpoint as a ground of decision, but that those who adopted or approved THA 1480.05A took content or viewpoint into account when deciding to change the rules for some federal prisoners but not others. This line of argument starts with the fact that reporters freely interviewed inmates of the Special Confinement Unit, including Hammer himself, for the first nine months of the Unit's existence—until shortly

after an interview with Timothy McVeigh was broadcast by CBS on "60 Minutes" in March 2000. (The Special Confinement Unit was established in July 1999; Hammer and McVeigh were among its first inmates.) McVeigh had been sentenced to death for killing 168 people by bombing the Murrah Federal Building in Oklahoma City. He used the forum of national TV to justify and extol terrorism. Shortly after the interview was broadcast, Byron Dorgan, who represents North Dakota in the Senate, wrote to Kathleen Hawk-Sawyer, Director of the Bureau of Prisons, complaining about the interview. Senator Dorgan stated, among other things:

> The American people have a right to expect that the incarceration of a convicted killer will not only remove him physically from society, but will also prevent him from further intrusion in our lives through television interviews and from using those forums to advance his agenda of violence.

About a month after Senator Dorgan sent that letter, Attorney General Ashcroft and Director Hawk-Sawyer announced arrangements for closed-circuit telecasting of McVeigh's execution and took some questions. Ashcroft also announced that the Bureau would replace its case-by-case evaluation system with a prohibition on in-person interviews of inmates at the Special Confinement Unit. Hammer finds telling these statements:

> I am aware that several media outlets have re-quested access to interview inmate McVeigh. As an American who cares about our culture, I want to restrict a mass murderer's access to the public

> podium. On an issue of particular importance to me as Attorney General of the United States, I do not want anyone to be able to purchase access to the podium of America with the blood of 168 innocent victims.
>
> . . .
>
> I'm concerned about irresponsible glamorization of a culture of violence, and that concern has shaped our approach to these issues profoundly.

On April 15, 2001, three days after the press conference, Harley Lappin, the Warden of Terre Haute, issued Institution Supplement THA 1480.05A.

Hammer wants discovery during which former Attorney General Ashcroft, former Director Hawk-Sawyer, and former Warden Lappin must explain under oath why they adopted the policy in question. If a belief that terrorists should not be able to obtain publicity by committing murder played a role in the decision, Hammer contends, the motivation for the policy is infirm, and the policy itself would fall with the bad motive.

It is not clear why one bad motive would spoil a rule that is adequately supported by good reasons. See *Mueller v. Allen*, 463 U.S. 388, 394–95 (1983). The Supreme Court did not search for "pretext" in *Turner*; it asked instead whether a rule is rationally related to a legitimate goal. That's an objective inquiry. If motive matters, why examine the thoughts of those who adopted the rule to the exclusion of those who have maintained it in force?—Attorney General Gonzales,

Solicitor General Clement (who authorized the petition for rehearing en banc), Attorney General Mukasey (who was in office when the Department of Justice defended the policy before the en banc court), and Attorney General Holder, who could revoke THA 1480.05A with one sentence plus a signature but has not done so. (There is no special burden to justify a change of administrative policy. See *FCC v. Fox Television Stations, Inc.*, 129 S. Ct. 1800, 1810–11 & n.2 (2009).)

Nor do we see how a demand that a Cabinet officer give testimony about his thinking could be squared with *United States v. Morgan*, 313 U.S. 409 (1941), and *PBGC v. LTV Corp.*, 496 U.S. 633 (1990). These decisions hold that courts evaluating the validity of an administrative action may not enlarge the administrative record by demanding that the people who proposed or approved the rule testify about their thinking. See also Richard J. Pierce, Jr., I *Administrative Law Treatise* §8.6 (2002).

For current purposes, however, we assume that Attorney General Ashcroft's successors share his views. There's nothing unconstitutional about them, so we need not decide whether they led to the policy's adoption and maintenance, how motivation could be proved consistent with *Morgan*, or what role it plays in evaluating a policy's validity. Opposing a "culture of violence" is an ordinary, and desirable, goal for a criminal prosecutor. Attorney General Ashcroft's statements combine the idea that criminals should not be allowed to benefit from their deeds (see *Simon & Schuster, Inc. v. New York Crime Victims Board*, 502 U.S. 105 (1991) (a state may apply all of

a criminal's income, including royalties from books, to satisfy restitution awards, though it can't pick and choose among books)) with variations of propositions that can be found in *Pell* and *Washington Post*.

One of the reasons that state and federal prison administrators gave for curtailing press access was that they did not want people to become celebrities by committing crimes. The Justices thought this a good basis to curtail press access, not a constitutionally infirm one. See *Washington Post*, 417 U.S. at 848–50. This is a reason why prisoners are separated from society: Most prisons are remote, and access to them tightly controlled, not simply to make escape difficult, but because solitude is a legitimate part of punishment. Becoming a celebrity makes crime more attractive—and if not so attractive as to outweigh the costs of prison, still anything that reduces the (effective) punishment for crime is of legitimate concern to Attorneys General and prison officials. For murderers on death row or serving life sentences, celebrity is *especially* attractive, as these persons do not expect to return to the civilian world. They will receive few other rewards in life.

Some criminal acts are both costly to society and potentially attractive to imitators; the most notorious criminals can be trend-setters. Timothy McVeigh was such a person. He had a following, and one of his admirers was recently convicted of threatening to blow up a federal building in Milwaukee. See *United States v. Parr*, 545 F.3d 491 (7th Cir. 2008). Other "cause" criminals want to recruit; think of those who blow up abortion clinics and kill

physicians. Social interests in curtailing and punishing crime support keeping these prisoners in seclusion. No one doubts—at least, no one *should* doubt—that a person serving time for tax evasion may be prevented from using the prison print shop to run off tracts advocating the proposition that the sixteenth amendment is invalid and no one need pay a penny of taxes. See *United States v. Benson*, 561 F.3d 718 (7th Cir. 2009) (affirming an injunction that prevents a convicted tax evader from selling a "16th Amendment Reliance Package" that purports to give other tax protesters a means to avoid both payment and criminal liability). If what Attorney General Ashcroft said in April 2001 evinces an unconstitutional motive, much of what this court wrote in *Benson* suffers from the same failing.

Naturally, Hammer insists that he is no McVeigh and would not use the press to promote murder. He wants to speak instead about prison conditions, his current professed respect for life, and what he sees as misconduct by guards and wardens. A system of rules that permitted prison administrators to conceal beatings or starvation of prisoners, violations of statutes and regulations, and other misconduct would be intolerable. The Court said as much in *Pell* and *Washington Post*. It was important to both decisions that all prisoners could correspond freely with reporters, even though face-to-face interviews were impossible. See *Pell*, 417 U.S. at 824–28; *Washington Post*, 417 U.S. at 847–48. Hammer sees this as an opening, because (he says) the Bureau of Prisons does not allow any uncensored channel of communication to the press.

This line of argument relies on Program Statement 1480.05(7)(d), which we quoted at the outset of this opinion. It provides: "A representative of the news media may not obtain and use personal information from one inmate about another inmate who refuses to be interviewed." As far as we can tell, this rule applies to interviews (in person or by telephone) but not to correspondence. Program Statement 5265.11(17)(a), which sets out the rules for written exchanges, says that "[a]ll properly identified and labeled correspondence from an inmate who is not on restricted mail status to qualifying representatives of the news media shall be sealed and forwarded without inspection, directly and promptly." That's exactly the sort of uncensored outgoing correspondence that the Court deemed adequate in *Pell* and *Washington Post*. (Hammer does not contend that persons held in the Special Confinement Unit are "on restricted mail status" or that the prison has ever red-penciled any letter he sent to a reporter.) The limit on information about other inmates deals only with oral interviews. And if Hammer were to prevail in this suit, he would not be rid of Program Statement 1480.05(7)(d), for it covers in-person and televised interviews as well as phone interviews.

To the extent that Hammer may be contesting the validity of Program Statement 1480.05(7)(d) as applied to phone calls with the press (the only way it affects him), he has not established any constitutional problem. The restriction is a rational one, for reasons covered in *Pell* and *Washington Post*. Telling tales about fellow inmates may make them angry (if the tales are defamatory) or may

make yet other inmates envious (if the tales are flattering). In either event, disorder may follow. As the district court put it, "insults or provocations, real or imagined, can result in inmate-on-inmate violence and thus can have dire consequences for inmates, penitentiary staff, and the public at large." 2006 U.S. Dist. LEXIS 9306 at *11–*12. Defamation is less likely if the other inmate agrees to talk to the press; Hammer may discuss such inmates by phone with reporters. And if, to take the worst case, another inmate is beaten and unable to talk, Hammer remains free to send a letter informing a reporter about that event. *Pell* and *Washington Post* held that free correspondence supplies the needed channel of communication; Hammer has that plus 15 minutes of telephone time a day.

Correspondence is not the only way to expose misconduct by guards and administrators. Prisoners are free to file lawsuits, and papers sent to courts (or lawyers) cannot be censored. See *Bounds v. Smith*, 430 U.S. 817 (1977); *Procunier v. Martinez*, 416 U.S. 396 (1974). So the limit in Program Statement 1480.05(7)(d) is not going to conceal any misconduct in which the public has a legitimate interest.

Institution Supplement THA 1480.05A is consistent with the Constitution, and the judgment of the district court is

AFFIRMED.

ROVNER, *Circuit Judge*, with whom Judge Bauer joins, dissenting. The original panel's opinion was firmly rooted in the Supreme Court's long-standing rule that a prison regulation infringing on an inmate's constitutional rights is valid only if "it is reasonably related to legitimate penological interests." *Turner v. Safley*, 482 U.S. 78, 89 (1987). When a prisoner challenges a prison policy on constitutional grounds, the government must put forward a "legitimate" government interest to justify the restriction. *Id.* Suppressing speech because government officials find the content offensive is not a legitimate penological interest. *Id.* at 90. The original panel concluded that David Paul Hammer presented evidence that created a question of material fact that the district court overlooked: is the jailhouse-celebrity concern articulated by the warden "legitimate," or is it simply a convenient explanation to justify a policy designed to control the speech content of a particular subset of prisoners? Given the fact dispute, the original panel reached the limited—indeed, even pedestrian—conclusion that a trier of fact must resolve the conflict.

Today's en banc opinion is almost entirely unmoored from the original panel's narrow treatment of the issues presented in this appeal. With scarcely a reference to *Turner*, today's opinion holds that a ban on face-to-face interviews in the prison system is justified if a judge can "imagine" a legitimate basis for its existence, glosses over facts regarding the application of the relevant policies, and concludes with the astonishing proposition that the government may limit a prisoner's access to the media based on its distaste for the anticipated content of the prisoner's speech. The en banc opinion thus autho-

rizes the government to deny the public a chance to hear directly from prisoners who can offer a glimpse of situations that may embarrass the government, such as torture and prisoner abuse, by invoking pretextual justifications for policies that are unrelated to security. For the reasons set forth in the original panel's opinion, I dissent. I write separately only to memorialize my additional disagreement with the unexpected breadth of the en banc opinion.

Let me begin with the most troubling aspect of today's opinion: the majority's willingness to push aside Attorney General Ashcroft's statement that "as an American who cares about our culture" and is "concerned about the irresponsible glamorization of a culture of violence," he wanted to prevent death-row inmates, and only death-row inmates, from engaging in face-to-face interviews with the media on any subject. This rationale for censorship assumes that what death-row inmates have to say, if broadcast outside the prison, necessarily corrodes American culture. But First Amendment jurisprudence is grounded in the idea that the government may not prevent a person, including a prisoner, from speaking merely because it disapproves of the speaker or what the speaker might say. *See, e.g., R.A.V. v. City of St. Paul*, 505 U.S. 377, 382 (1992) (noting that "content-based restrictions are presumptively invalid"); *Turner*, 482 U.S. at 90 (stating that prison regulations that infringe on inmates' First Amendment rights must operate "in a neutral fashion, without regard to the content of the expression"); *Regan v. Time, Inc.*, 468 U.S. 641, 648-49 (1984) ("Regulations that permit the Government to discriminate on the basis

of the content of the message cannot be tolerated under the First Amendment."). Indeed, this court has recognized that the government may not pass speech restrictions in an effort to preserve its own notions of valued American culture:

> Racial bigotry, anti-semitism, violence on television, reporters' biases-these and many more influence the culture and shape our socialization. None is directly answerable by more speech, unless that speech too finds its place in the popular culture. Yet all is protected as speech, however insidious. Any other answer leaves the government in control of all of the institutions of culture, the great censor and director of which thoughts are good for us.

See *American Booksellers Ass'n, Inc. v. Hudnut*, 771 F.2d 323, 330 (7th Cir. 1985) (Easterbrook, J.). Yet Attorney General Ashcroft said publicly that preserving his version of American culture is exactly why the Bureau decided to limit death-row inmates' access to the media.

In order to circumvent this problem, the majority applies its own interpretive spin to Attorney General Ashcroft's statements and decides that the Attorney General meant that "criminals should not be allowed to benefit from their deeds." The majority thus concludes that Attorney General Ashcroft articulated a legitimate penological purpose to the interview ban because he saw restricting face-to-face interviews as a form of punishment or deterrence. But that is a question for a fact finder, who might reject this post-hoc rationaliza-

tion and instead take Attorney General Ashcroft at his word and conclude that what actually "shaped" his mind in enacting the ban is his desire to prevent death-row prisoners from influencing our "culture." That desire is not a legitimate penological purpose.

The majority's comparison of this case to *United States v. Benson*, 561 F.3d 718 (7th Cir. 2009), is unhelpful. In *Benson* we held that a convicted tax offender may not market materials that encourage other people to evade tax laws. *Benson* dealt with commercial speech, which occupies its own niche in First-Amendment juris-prudence, *see Central Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of New York*, 447 U.S. 557, 562-63 (1980), and concluded that it is permissible to enjoin a person from making false statements in connection with the sale of a product, *Benson*, 561 F.3d at 725-26. Even accepting the majority's assumption that Attorney General Ashcroft wanted to prevent inmates from encouraging violence, the parallel to *Benson* is unpersuasive. Deceiving the public into buying a product designed to evade payment of required taxes is illegal, *see* 26 U.S.C. § 6700(a); advocat-ing unpopular ideas is not, *see Brandenburg v. Ohio*, 395 U.S. 444, 448-49 (1969).[1]

The original panel was also concerned that the Special Confinement Unit's prohibition on face-to-face inter-

---

[1] Of course the government may regulate speech that amounts to incitement of violence, *see Brandenburg*, 395 U.S. at 447, but not even today's majority suggests that Ashcroft intended the media ban to target that category of speech.

views does not leave sufficient alternatives for death-row inmates to access the media. Today's opinion concludes that the alternatives are sufficient because death-row inmates have 15 minutes of telephone time each day that they can use to speak with reporters, and because they are entitled to unlimited correspondence. But the government concedes that death-row inmates are not allowed—through any method of communication—to discuss other inmates with members of the media. I am particularly troubled by this aspect of the policy because it may prevent inmates from reporting prison abuse. Under the current policies an inmate could be disciplined for informing the media—whether on the phone or by letter—that another inmate is being abused by a guard. When this concern was raised at the en banc argument, counsel for the defendants asserted that a victimized inmate could report the abuse himself. But that suggestion ignores the reality that any guard who abuses an inmate is likely to pressure his victim not to disclose the abuse, and such threats are particularly effective.

Today the majority brushes aside this concern, because "as far as [it] can tell," the ban on talking about other inmates does not apply to written correspondence. It relies on a program statement that says that outgoing mail to the media is sent without inspection. But at the en banc argument, counsel for the defendants said that all mail sent by inmates at the Special Confinement Unit must be given to prison officials unsealed for inspection before it is mailed. When asked what would be the consequence to an inmate who sends a letter discussing another inmate, counsel for the government had no

answer. Thus our original fears are unabated; on this record we cannot tell whether there is any satisfactory alternative for inmates at the Special Confinement Unit to give the media any information that involves other inmates.

Which leads to another concern that today's opinion glosses over completely—Hammer was denied the opportunity to create a full record at the summary judgment stage. As discussed in the original opinion, the government moved for summary judgment before the close of discovery and only then responded to Hammer's discovery requests by objecting to them. Hammer asked for a continuance to allow him to build an adequate record, but the district court did not rule on his motion before the deadline for his summary-judgment response. To avoid missing his deadline, Hammer was forced to respond without receiving any discovery from the defendants. Today's opinion is quick to fill in the blanks itself in the face of ambiguity about the interests underlying the challenged policy. That is a task that may not have been necessary had Hammer had the chance to conduct proper discovery or if the district court had granted any of Hammer's three requests for counsel.

The majority's treatment of Hammer's equal-protection argument is also untethered from the governing legal standard and the facts of this case. The majority assumes that the media ban applies to all inmates housed in the Special Confinement Unit and concludes that the policy passes constitutional muster because the majority can "imagine a rational basis for distinguishing the nation's

most secure institutions from others." But the parties agree that the media ban applies only to those members of the Special Confinement Unit who are under a death sentence. It is not, as the majority assumes, a unit-wide ban, as not all inmates at the Special Confinement Unit are death-row inmates. That distinction casts doubt on the legitimacy of the "jailhouse celebrity" concern articulated by the government because, as Hammer point out, it is irrational to distinguish among inmates based solely on their particular sentence. Under the policy as applied by the Bureau of Prisons, famous mafia members, leaders of violent drug gangs, and the former governor of Illinois may all meet face-to-face with the press. But an unknown inmate under a death sentence may not because, the Bureau says, such access could make them "jailhouse celebrities." It is unclear why speaking in-person with a journalist would give an unknown death-row inmate more influence over other prisoners than would, for example, allowing Martha Stewart or George Ryan to give face-to-face interviews during their incarceration, which they would have been or are free to do under the Bureau's policies. As the majority points out, distinguishing among inmates risks "engendering hostility and resentment among inmates who were refused interview privileges granted to their fellows." *See Saxbe v. Washington Post Co.*, 417 U.S. 843, 849 (1974). Yet here the Bureau of Prisons applies the media ban in such a way as to risk the very dangers it says it wants to avoid.

Finally, the majority is concerned that a remand in this case could subject the former, and perhaps current, Attorney General to discovery, and that any demand for

his testimony would rub up against *United States v. Morgan*, 313 U.S. 409 (1941). The *Morgan* cases hold that an agency head should not be required in litigation to explain all of the considerations that went into a decision that was the result of formal rulemaking or a quasi judicial proceeding. *Id.* at 421-22. Administrative decisions must be judged based on the administrative record or evidence adduced by the parties. The *Morgan* principle is not offended here because the media ban was not the result of any formal agency process. On the contrary, there was neither notice nor a hearing before the media ban went into effect. Accordingly, even if on remand Hammer sought to depose Attorney General Ashcroft— who, after all, chose to speak publicly about the rationale behind the media ban—such scrutiny would not upset "the integrity of the administrative process." *Id.*

I believe that in the rare circumstances where a prisoner submits evidence casting doubt on the legitimacy of the security rationale supposedly supporting a policy, he deserves to have the chance to create a full record to shed light on those circumstances, and ultimately, to have a trier of fact resolve disputes of fact. I stand by that holding, and accordingly, I dissent.

WOOD, *Circuit Judge*, dissenting.   Although I agree with much of Judge Rovner's dissent, I write separately in order to highlight my own concerns with the majority's opinion. Briefly put, they are as follows: first, the record does not support certain key assumptions made in the majority's opinion; second, and related to the first point, it was error to grant summary judgment in favor of the defendants without permitting the plaintiff, David Hammer, to develop the record properly; and third, the majority has erred by adopting a rule permitting wholesale censorship in prisons—one that goes much farther than anything the Supreme Court sanctioned in *Pell v. Procunier*, 417 U.S. 817 (1974), or *Saxbe v. Washington Post Co.*, 417 U.S. 843 (1974).

First, we must look at the record. Central to the majority's analysis is the assumption that inmate "[c]orrespondence is unlimited; an inmate's letters to reporters are not subject to inspection or censorship." *Ante* at 3. In support of this proposition, the majority cites Bureau of Prisons ("BOP") Program Statement ("PS") 5265.11(17)(a) (July 9, 1999). It then goes on to say that "[p]hone calls with reporters are subject to [PS] 1480.05(7)(d), which provides that '[a] representative of the news media may not obtain and use personal information from one inmate about another inmate who refuses to be interviewed.'" What the majority brushes over, however, is the fact that there is nothing in paragraph 7(d) of the Program Statement (or any other part of that Statement) that limits this restriction to information collected through telephone calls. In fact, materials in the record suggest strongly that the prohibition

extends to all forms of communication. For example, the record includes a letter from Warden Lappin to a lawyer who published a news release that included statements that inmate Hammer made about other inmates. (Plaintiff's Appendix at A169.) The Warden's letter rebukes the lawyer and informs him that 28 C.F.R. § 540.61(d) prohibits this publication. That regulation applies to all collection of information by the media, not just to telephone calls. *Id.* In a memorandum of December 22, 2000, from the Warden directly to Hammer, the Warden reprimands Hammer for providing information concerning other inmates "during a recent news media interview." (Plaintiff's Appendix at A171.) The memorandum says nothing about the form the interview took. Two weeks later, in response to Hammer's request for clarification, Warden Lappin replies "You are hereby ordered not to provide any information concerning other inmates during news media interviews, social calls, *or correspondence with the media*." (Plaintiff's Appendix at A172; emphasis added.)

At oral argument before this court, counsel for the governmental defendants did not endorse the narrow rule that the majority has postulated. To the contrary, counsel said that *all* mail sent by inmates in the Special Confinement Unit (where Hammer is incarcerated) must be given to prison officials unsealed for inspection before it is mailed. Although this might seem to conflict with PS 5265.11(17)(a), which provides that properly identified and labeled correspondence from an inmate *not* on restricted mail status to qualifying representatives of the news media "shall be sealed and forwarded

without inspection, directly and promptly," that rule is not unqualified. Most importantly, mail from inmates on restricted special mail status is subject to inspection, and PS 5265.11(17) is expressly made subject to the Program Statement on News Media Contacts—that is, to PS 1480.05. The record does not establish whether Hammer was on restricted mail status, but it indicates that he may have been. (It would not surprise me if everyone in the Special Confinement Unit were subject to additional restrictions.) Furthermore, it is still necessary to reconcile 28 C.F.R. § 540.61(d), PS 5265.11(17), and PS 1480.05(7)(d). It seems most consistent with all of these materials (and consistent with both Warden Lappin's interpretation and the government's representation) to conclude that if a prisoner wrote a letter to a representative of the media that conveyed information about a fellow inmate, the letter would be confiscated. Without the linchpin provided by its assumption that correspondence is free, the majority's rationale collapses.

This brings me to my second point—again one that Judge Rovner has also emphasized: Hammer was blocked completely from developing a record at the summary judgment stage. The government moved for summary judgment before the close of discovery and then refused to comply with Hammer's requests. This left Hammer with little or nothing on which to rely when he attempted to oppose the summary judgment motion. The majority here sets up a straw man, claiming that the only thing that would suffice would be direct depositions of former Attorney General John Ashcroft, former Director of the BOP Kathleen Hawk-Sawyer, and former

Warden of the U.S. Penitentiary at Terre Haute Harley Lappin, in which Hammer tried to unmask their "true" reason for the new rules. The majority is worried that such untrammeled discovery would be inconsistent with *United States v. Morgan*, 313 U.S. 409 (1941), and *PBGC v. LTV Corp.*, 496 U.S. 633 (1990). Its concerns are misplaced. First, it is a mistake to lump all three defendants into the same group. As the Supreme Court's recent decision in *Ashcroft v. Iqbal,* 129 S.Ct. 1937 (2009), underscores, it is one thing to acknowledge that a high official has knowledge of a particular policy, or even approves of it personally; it is quite another to plead that the official was personally responsible for a violation of constitutional rights. Here, the record already includes the public statements—reproduced *ante* at 8-9—that former Attorney General Ashcroft made about the media ban. In my opinion, the district court could easily respect the policies animating *Morgan* and *LTV* simply by limiting to publicly available information (including whatever falls within the scope of the Freedom of Information Act) any further exploration of the Attorney General's position.

It is by no means unprecedented to seek the deposition of the Director of the BOP or the warden of a particular prison. Once again, the district court would be in a position to decide whether such a measure was necessary, or if alternatives (including production of documents or answers to interrogatories; perhaps even depositions upon written questions) would suffice. Hammer has a right to explore whether the media ban was based upon legitimate penological concerns—in which case it is legal under the well-established standards of *Turner v. Safley*, 482

U.S. 78, 89 (1987)—or if it was instead designed to stifle speech because the authorities fear that the content will be unwelcome. The latter is, unfortunately, not beyond imagination. It is likely that the military authorities running the infamous Abu Ghraib prison would not have wanted the inmates talking to the media, either about their own experiences or those of their fellow prisoners (some of whom may have been too injured, or too intimidated, to speak for themselves). Closer to home, the sad but true fact is that abuse by prison guards or police has not been entirely abolished. One prisoner might want to write letters that are self-aggrandizing, just as the authorities feared, but another might want to alert the media to the fact that human rights abuses were occurring in a place like the Special Confinement Unit. Censorship of all avenues of communication—which, as I have said, is what this record shows—would be an all-too-effective way to prevent the public from ever learning about such problems.

That leads me to the final point, which is the one that Judge Rovner has emphasized: the First Amendment implications of the media ban. While I certainly agree with her that there is a potential First Amendment problem here, I see this case as a textbook example of the wisdom of the rule of constitutional avoidance. It seems elementary to me that before this court, or any court, should reach an important constitutional question, the record should be developed properly and we should know what we are talking about. That has not happened in this case. The majority has filled in the gaps with speculation, both about possible loopholes that might make written correspondence an adequate outlet for

prisoners despite the media rule, and about possible penological justifications for the rule. This is not the way that we should approach a question as important as the balance between First Amendment rights of prisoners—which *Turner* recognizes are not forfeited entirely—and the critical job of prison officials to ensure security and safety within the prison walls. It is worth noting, however, that neither *Pell* nor *Washington Post* approved a total ban on contact with the media. To the contrary, *Pell* relied on the existence of "alternative methods of communication that are open to prison inmates," 417 U.S. at 504, and *Washington Post* made clear that "members of the press are accorded substantial access to the federal prisons in order to observe and report the conditions they find there," 417 U.S. at 518. *Washington Post* mentioned specifically the fact that "[o]utgoing correspondence from inmates to press representatives is neither censored nor inspected." *Id.* To the extent that the majority's opinion has swept away the need to show adequate alternative avenues for communication, it has, in my view, overstepped an important boundary that the Court has drawn.

As the original panel opinion did, I would therefore reverse the grant of summary judgment and remand this case to the district court for further proceedings, along the lines I have outlined here. I therefore respectfully dissent.